[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 17-12802

_____

D.C. Docket No. 8:16-cv-02753-CEH-AAS

CAMBRIDGE CHRISTIAN SCHOOL, INC.,

Plaintiff - Appellant,

versus

FLORIDA HIGH SCHOOL ATHLETIC ASSOCIATION, INC.,

Defendant - Appellee.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(November 13, 2019)

Before TJOFLAT, MARCUS and NEWSOM, Circuit Judges.

MARCUS, Circuit Judge:

At the end of the 2015 high school football season, Cambridge Christian

School and University Christian School faced off in the Division 2A State

Championship Game, supervised and regulated by the Florida High School Athletic Association ("FHSAA"), a state actor.  The two schools, both Christian institutions, asked the FHSAA for permission to conduct a joint prayer over the loudspeaker before kickoff, as they each typically did before all other games.  The schools presented this request and the practice of communal prayer more generally as being tied to their religious missions and as being very important to the members of their communities.  The FHSAA denied the request, citing the Supreme Court's Establishment Clause precedent and the principle of "separation of church and state."

Cambridge Christian then brought this lawsuit in federal district court, raising a variety of claims, primarily arising under the Free Speech and Free Exercise Clauses of the United States and Florida Constitutions.  The school alleged that its right to freedom of speech was violated when the FHSAA denied access to the loudspeaker for its proposed religious speech while at the same time allowing secular messages to be transmitted.  It also claimed that its right to Free Exercise was similarly violated -- communal prayer was integral to its spiritual tradition and practice, and, without access to the loudspeaker system, the school was unable to unite players and spectators in communal prayer before the last and most important game of the season.  Cambridge Christian asked the district court for declaratory and injunctive relief as well as damages.

2

The trial court dismissed the entirety of Cambridge Christian's complaint for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). For starters, it concluded, on the Free Speech claims, that all speech over the loudspeaker was government speech and therefore that the school enjoyed no expressive freedoms in that medium. In the alternative, the court determined that the loudspeaker was a nonpublic forum and that Cambridge Christian was not entitled to access it. As for the Free Exercise Clauses, the court held that the school's free exercise rights had not been implicated when the FHSAA denied access to the loudspeaker because the teams were still allowed to pray together at the center of the football field, albeit without the aid of a loudspeaker system. Finally, the trial court denied declaratory relief under the Establishment Clauses on the ground that the controversy was more properly framed under the other clauses.

As we see it, the district court was too quick to dismiss all of Cambridge Christian's claims out of hand. Taking the complaint in a light most favorable to the plaintiff, as we must at this stage in the proceedings, the schools' claims for relief under the Free Speech and Free Exercise Clauses have been adequately and plausibly pled. There are too many open factual questions for us to say with confidence that the allegations cannot be proven as a matter of law. The question of whether all speech over the microphone was government speech is a heavily fact-intensive one that looks at the history of the government's use of the medium

3

for communicative purposes, the implication of government <u>endorsement</u> of messages carried over that medium, and the degree of government <u>control</u> over those messages. Here, the history factor weighs against finding government speech and the control factor is indeterminate, so, based on this limited record, we find it plausible that the multitude of messages delivered over the loudspeaker should be viewed as private, not government, speech. And while we agree with the district court that the loudspeaker was a nonpublic forum, we conclude that Cambridge Christian has plausibly alleged that it was arbitrarily and haphazardly denied access to the forum in violation of the First Amendment. Likewise, we cannot say, again drawing all inferences in favor of the appellant, that in denying communal prayer over the loudspeaker, the FHSAA did not infringe on Cambridge Christian's free exercise of religion.

We, therefore, reverse the district court's decision in part. The lower court was too quick to pull the trigger insofar as it dismissed the appellants' free speech and free exercise claims. We cannot say whether these claims will ultimately succeed, but Cambridge Christian has plausibly alleged enough to enter the courtroom and be heard.

We do agree with the district court, however, that Cambridge Christian has failed to plead a "substantial burden" under the Florida Religious Free Restoration Act (FRFRA) because it has not alleged that the FHSAA <u>forbade</u> it from engaging

in conduct that its religion mandates.  Thus, we affirm the district court's dismissal of the FRFRA claim.  We also affirm the district court's decision in part, insofar as it rejected the school's request for declaratory relief under the Establishment Clauses.

I.

A.

Cambridge Christian School is a private Christian school in Tampa, Florida, running from preschool through twelfth grade.  Like many private schools, Cambridge Christian's religious mission is an integral part of its identity.  The school's overall religious mission is stated this way: "To glorify God in all that [it does]; to demonstrate excellence at every level of academic, athletic, and artistic involvement; to develop strength of character; and to serve the local and global community."

Prayer is especially important to Cambridge Christian; it is a basic part of many school activities, including its class lectures and meals, and it has been fully incorporated into the mission of the school's athletic department.  The athletic department defines its mission this way: "to glorify Christ in every aspect of [its] athletic endeavors while using the platform of athletics to: Teach the Principles of Winning; Exemplify Christian Morals and Values in [its] Community; Achieve Maximum Physical, Moral and Spiritual Character Development; and Mentor

Young Men and Women to Deeper Walk with Jesus." In service of this mission, Cambridge Christian has a "long-standing tradition" of beginning all sporting events with an opening prayer, led by a student, parent, or school employee, delivered using the loudspeaker at home events "and at away games when possible." The school would "not pre-select or pre-approve an official prayer" or "provide a script or any direction . . . ; rather, the speakers chose and delivered their messages themselves."

Cambridge Christian's football team played in Division 2A, which was supervised and regulated by the Florida High School Athletic Association. The FHSAA is "the governing nonprofit organization of Florida high school athletics." The FHSAA was so designated by the Florida legislature in 1997, and, because of the statutory delegation of authority, is a state actor. Fla. Stat. § 1006.20 (2016). It includes over 800 member high schools throughout Florida, many of which are private and religious in nature. Notably for our purposes, the FHSAA organizes and oversees championship games for all Florida high school athletics divisions.

The complaint states that Cambridge Christian fielded a successful football team in 2015; they won all nine of their regular season games and made it to the Division 2A playoffs. That season, Cambridge Christian claims that it had prayed over the loudspeaker at "each home regular season game as well as [at] away games, whenever possible." In three earlier rounds of the playoffs, Cambridge

6

Christian was the home team, and hosted the games at Skyway Park, a public facility in Tampa owned by Hillsborough County. Before each of these games, Cambridge Christian apparently was allowed to pray over the loudspeaker at Skyway Park. At the end of the season, Cambridge Christian's football team was playing in the Division 2A Florida state football championship at Camping World Stadium (formerly known as the Citrus Bowl) in Orlando. The stadium has a regular capacity of 41,000 for football games. Cambridge Christian's opponent in the championship was University Christian School, "a school with a similar mission and traditions involving prayer."

During a December 1, 2015 conference call with the FHSAA -- three days before the big game -- representatives of Cambridge Christian and University Christian asked to use the loudspeaker at the stadium to lead attendees in a pre-game prayer. University Christian explained that it had been allowed by the FHSAA to use the loudspeaker prior to a 2012 championship game against a different Christian school. But this year, its request was denied. The following day, Tim Euler, the Head of School at Cambridge Christian, sent an email to Roger Dearing, the Executive Director of the FHSAA, asking again that the schools be allowed to use the loudspeaker for a pre-game prayer. Heath Nivens, the Head of School of University Christian, followed up with a similar email making the same request of the FHSAA. Dearing responded later that day and said he was unable to

7

comply with their request.  He explained that the facility was a public facility, that the FHSAA was a "state actor" and, therefore that it could not permit or grant a request for pre-game prayer.

The game was played on December 4, 2015, before a crowd of 1,800. "Immediately prior to the start of the game, the two teams met at the 50-yard line to pray together as a sign of fellowship," Am. Compl. ¶ 50, but the loudspeaker was not allowed to be used for prayer.  Fans were unable to hear the pre-game prayer due to the size of the stadium.  Thus, says Cambridge Christian, "the FHSAA denied the students, parents, and fans in attendance the right to participate in the players' prayer or to otherwise come together in prayer as one Christian community."  Notably, before, during, and after the game, the PA system was used by the FHSAA public-address announcer to "deliver[] various messages, including advertisements, commentary, and other communications."  At halftime, each team was given seven minutes for its cheerleading squad to perform.  During this time Cambridge Christian says it was permitted by the FHSAA to "take control of the loudspeaker," which the cheerleading coach used to play music from her smartphone.  No apparent limitations were placed on the content of the messages the schools could and did deliver at halftime.

On December 7, the Monday following the game, the FHSAA emailed the schools again, reiterating its decision not to allow prayer over the loudspeaker at

8

the start of the game.  The FHSAA explained that prayer before football games had

been "richly debated – and decided in the courts of the United States."  He

referenced -- unmistakably, but not by name -- the Supreme Court's decision in

Santa Fe Independent School District v. Doe, 530 U.S. 290 (2000), as being

"directly on point" and as established precedent preventing the FHSAA from

granting the request.  Doing so, the Association explained, would mean that a

"state actor" was "endors[ing]" or "promot[ing] religion."  The email also argued

that no one had really been prevented from praying:

> The fact of the matter is that both schools involved had prayer on the
> field, both before and after the football game.  The issue was never
> whether prayer could be conducted.  The issue was, and is, that an
> organization [the FHSAA], which is determined to be a 'state actor'
> cannot endorse nor promote religion.  The issue of prayer, in and of
> itself, was not denied to either team or anyone in the stadium.  It is
> simply not legally permitted under the circumstances, which were
> requested by [Cambridge Christian].

The FHSAA explained its position again, in similar terms, in a press release issued

the following January.[1]  Cambridge Christian points to these repeated statements as

evidence of an ongoing policy evincing hostility to religious expression.

---

[1] The statement said that "The FHSAA has always accommodated pre- and post-game on-field
prayer opportunities for its member schools."  It explained, from the FHSAA's perspective, that
the following were "the facts" regarding Cambridge Christian's prayer request:

- The FHSAA received a request for a prayer to be lead over the PA system at The
  Citrus Bowl.

B.

Cambridge Christian attached as exhibits to its complaint the Administrative Procedures of the FHSAA and the 2015 FHSAA Football Finals Participant Manual. At this early stage of litigation, and without the benefit of any discovery, these exhibits are critical to our understanding of the school's claims and the FHSAA's decisionmaking.

The Administrative Procedures "govern the [FHSAA]'s interscholastic athletic programs," and "apply to all regular season contests as well as . . . Championships." They read this way about the PA system:

> **Public-Address Protocol.** The public-address announcer shall be considered a bench official for all Florida High School State Championship Series events. He/she shall maintain complete neutrality at all times and, as such, shall not be a "cheerleader" for any team. The announcer will follow the FHSAA script for promotional announcements, which are available from this association, player introductions and awards ceremonies. Other announcements are limited to:
> - Those of an emergency nature (e.g., paging a doctor, lost child or parent, etc.);

- The request for prayer to be lead publicly over the PA system was denied, in accordance with a prior U.S. Supreme Court decision (Texas, 2000) and Florida Statutes.

- The FHSAA presented alternative options for team prayers, including on-field prayer, in lieu of the publicly lead prayer, as requested, over the PA system.

- Representatives of each participating school accepted the FHSAA's alternative options to the initial request.

- Both teams participated in a personally lead on-field organized prayer prior to and following the 2A State Championship game at The Citrus Bowl.

The press release also included photographs of the players and coaches praying together on the field before and after the game.

10

- Those of a "practical" nature (e.g., announcing that a driver has left his/her vehicle lights on);
- Starting lineups or entire lineups of both participating teams (what is announced for the home team must be announced for the visiting team); and
- Messages provided by host school management; and
- Announcements that FHSAA souvenir merchandise, souvenir programs and concessions are on sale in the facility. During the contest, the announcer:
- Should recognize players about to attempt a play (e.g., coming up to in baseball [*sic*], punting, kicking or receiving a punt or kick in football, serving in volleyball, etc.);
- Should recognize player(s) making a play (e.g., "Basket by Jones" in basketball, "Smith on the kill" in volleyball, etc.);
- Should report a penalty as signaled by the referee;
- Should report substitutions and timeouts;
- Must not call the "play-by-play" or provide "color commentary" as if he/she were announcing for a radio or television broadcast;
- Must not make any comment that would offer either competing team an unfair advantage in the contest; and
- Must not make any comment critical of any school, team, player, coach or official; or any other comment that has the potential to incite unsporting conduct on the part of any individual.

The announcer should be certain of the accuracy of his/her statements before making them. When in doubt, the announcer should remain silent.

Regarding halftime, the Administrative Procedures specify that halftimes in football games will be twenty minutes, that school bands may perform at halftime for up to eight and a half minutes per side, and that the same number of cheerleaders in uniform as cheered during the regular season may be admitted free of charge. The Administrative Procedures do not say anything about accessing or using the PA system during halftime. Dearing (the FHSAA Executive Director)

11

later attested in a declaration that FHSAA policy allows the PA announcer "to play a musical selection provided by the school for that school's cheerleaders during their half-time performance if that school does not have a band to play the musical selection." No apparent limitations were included.

While the Administrative Procedures govern the entire football season, the Participant Manual is specific to the state championship games which were to be held over the weekends of December 4–5 and 11–12, 2015. It was provided to Cambridge Christian either shortly before or just after their December 1 conference call. The Manual provides game day schedules, facility and game operations, sidelines access rules, and similar information that schools playing in the games would need. It set out the following schedule for the Division 2A Championship Game: The field would become available to teams at 11:37 AM. The stadium would open at 12:00, with all officials and the PA announcer in place by 12:15. Pre-game warm ups would end at 12:37, thirty minutes before kickoff. A Scholar Athlete Award would be given around that same time. The announcer would begin a pre-game script at 12:47. There would then be a presentation of colors, the Pledge of Allegiance, and a performance of the National Anthem. At 12:52, the teams would be lined up in their tunnels, and they would be introduced. Captains and officials would head to midfield for a coin toss at 1:04, and kickoff would be at 1:07.

12

A form attached to the end of the Participant Manual provides some information about halftime performances.  It contains a section titled "Cheerleader Information," and indicates that halftime performances would be seven minutes long.  The form asks whether a cheer team from the school would be performing at halftime.  The next section is titled "Band and Drill Information" and asks whether a band would perform (again, for seven minutes) at halftime, and whether the school had "a half time announcer."

## C.

Cambridge Christian filed this lawsuit against the FHSAA on September 27, 2016 in the United States District Court for the Middle District of Florida.  After amending its complaint on September 30 and moving for a preliminary injunction on the same day, the school leveled seven charges against the FHSAA.  Count I alleged that since secular messages were conveyed over the state's loudspeaker, the FHSAA's policy "prohibit[ed] religious speech, and only religious speech, from being broadcast."  Thus, the FHSAA had "place[d] a substantial burden on Cambridge Christian's sincerely held religious beliefs by not allowing [it] to partake in its religious tradition of pre-game prayer over the loudspeaker."  The school claimed this constituted "content-based and viewpoint-based discrimination" in violation of the First Amendment.  In Count I, the school sought injunctive relief against the FHSAA policy and damages under § 1983, plus fees

13

and costs.  Count II sought a declaratory judgment that the policy violated the Free Speech and Free Exercise Clauses, along with, again, injunctive relief against the Policy, damages, fees, and costs.  Count III also sought a declaratory judgment that the FHSAA's policy was not required by the Establishment Clause, and, for a third time, injunctive relief, damages, fees, and costs.  Counts IV through VI replicated the first three, but were brought under the Florida Constitution's parallel Free Speech, Free Exercise, and Establishment Clauses.[2]  Finally, Count VII alleged a violation of Florida's Religious Freedom Restoration Act because the FHSAA "intentionally place[d] a substantial burden on Cambridge Christian's sincerely held religious beliefs by not allowing [the school] to partake in its tradition of pre-game prayer over the loudspeaker as required by its religious mission."  This final count also sought injunctive relief, damages, fees, and costs.

The FHSAA moved to dismiss the complaint, arguing that nothing in the First Amendment or in Florida's Constitution or the Florida Statutes compelled it "to engage in proselytization of audience members attending state-sponsored

---

[2] Florida's courts have treated the Free Speech and Free Exercise Clauses of the Florida Constitution as being coextensive with those embodied in the United States Constitution, and have adopted the same principles and methods of analysis.  See Cafe Erotica v. Fla. Dep't of Transp., 830 So. 2d 181, 183 (Fla. 1st DCA 2002) (Free Speech); Toca v. State, 834 So. 2d 204, 208 (Fla. 2d DCA 2002) (Free Exercise).  The Florida Establishment Clause, however, goes somewhat further than the corresponding clause in the United States Constitution by decreeing that "[n]o revenue of the state or any political subdivision or agency thereof shall ever be taken from the public treasury directly or indirectly in aid of any church, sect, or religious denomination . . . ."  Fla. Const. art. I, § 3; see also Atheists of Fla., Inc. v. City of Lakeland, Fla., 713 F.3d 577, 595–96 (11th Cir. 2013) (comparing the Establishment Clauses).

sporting events," and that while no one was denied the ability to express themselves through prayer, the law did not require <u>or</u> permit the FHSAA "to promote sectarian prayer through state-run public address systems." It emphasized "the neutral Public-Address Protocol," under which "the public-address announcer is the only one making statements and providing announcements over the public-address system," and that members of the Cambridge Christian community were not prevented from praying together on the field, but only from using a loudspeaker system to do so. The Magistrate Judge to whom the case was referred issued a Report and Recommendation (R&R) recommending that the Motion to Dismiss be granted in all respects and that preliminary injunctive relief be denied. The district court agreed and adopted the Magistrate Judge's R&R.

The district court began its analysis by addressing Cambridge Christian's Free Speech claims. It concluded, based on a review of the complaint, that all communication over the loudspeaker during the 2A Championship was <u>government</u> speech, thereby eliminating all of the Free Speech claims but that, in the alternative, even if some of the speech over the loudspeaker was private speech, it occurred in a nonpublic forum where the exclusion of Cambridge Christian's requested prayer amounted to a permissible content-based restriction. The district court also concluded that the complaint failed to state a claim under the Free Exercise Clause, reasoning that the school had not been prevented from

15

engaging in prayer. Public, communal prayer was conducted "at the most central location of the Stadium," the center of the field, and, the court reasoned, simply denying access to the PA system did not affect the school's ability to hold communal prayer or to act pursuant to its beliefs.

The remaining claims were dealt with in quick succession. The claim for declaratory relief stating that the Establishment Clause did not require the FHSAA to bar the school from access to the loudspeaker for the purposes of prayer was dismissed because there was "no actual controversy as to this claim," and because Cambridge Christian's arguments under the Establishment Clause were better considered under the Free Exercise and Free Speech Clauses. Finally, Cambridge Christian failed to state a claim under the Florida Religious Freedom Restoration Act, Fla. Stat. § 761.03, because pre-game prayer was "required by its religious *mission*," and not by its "religious belief," and thus any burden on Cambridge Christian's actual *beliefs* was not a substantial one. A preliminary injunction was also denied.

Cambridge Christian timely appealed to this Court.

## II.

"We review <u>de novo</u> the grant of a Rule 12(b)(6) motion to dismiss for failure to state a claim. We accept, as we must at this stage, the allegations in the complaint as true and construe them in the light most favorable to the plaintiff[]."

16

Ray v. Spirit Airlines, Inc., 836 F.3d 1340, 1347 (11th Cir. 2016).  We then ask

whether the complaint "contain[s] sufficient factual matter . . . to 'state a claim to

relief that is plausible on its face.'"  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)

(quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)); see also Ray, 836

F.3d at 1347–48.  "A claim has facial plausibility when the plaintiff pleads factual

content that allows the court to draw the reasonable inference that the defendant is

liable for the misconduct alleged."  Iqbal, 556 U.S. at 678.

"We review the district court's dismissal of a Declaratory Judgment Act

claim for an abuse of discretion.  Since its inception, the Declaratory Judgment Act

has been understood to confer on federal courts unique and substantial discretion in

deciding whether to declare the rights of litigants.  The act vest[s] district courts

with discretion in the first instance[] because facts bearing on the usefulness of the

declaratory judgment remedy, and the fitness of the case for resolution, are

peculiarly within their grasp."  Smith v. Casey, 741 F.3d 1236, 1244 (11th Cir.

2014) (citations and quotations omitted); see also 28 U.S.C. § 2201(a) (providing

that district courts "may" exercise jurisdiction over a declaratory judgment claim).

Finally, the denial of a preliminary injunction is reviewed for abuse of

discretion, but the underlying legal conclusions are reviewed de novo.  Bloedorn v.

Grube, 631 F.3d 1218, 1229 (11th Cir. 2011).  We also review "core constitutional

facts" de novo, while historical facts are reviewed only for clear error.  Id.

17

Historical facts deal with "the who, what, where, when, and how of the controversy," while constitutional facts are the "'why' facts" that relate to "intent" or "motive." ACLU of Fla., Inc. v. Miami-Dade Cty. Sch. Bd., 557 F.3d 1177, 1206 (11th Cir. 2009).

## III.

Perhaps of greatest significance, the parties disagree about how we ought to classify and analyze Cambridge Christian's claims under the Free Speech Clauses. The Florida High School Athletic Association claims that all speech over the loudspeaker was government speech, and thus not subject to the expressive speech provisions of the First Amendment at all. The FHSAA argues in the alternative that even if the prayer would have been private speech, the public-address system was still a nonpublic forum to which the FHSAA reasonably denied access in light of the forum's purpose. Cambridge Christian argues, however, that the public-address system was a limited public forum, but that forum analysis is beside the point because the FHSAA discriminated against its speech on the basis of its religious viewpoint, which would be impermissible even in a nonpublic forum.

The district court reached two basic, albeit independent conclusions on the Free Speech claims. First, it held that all communication over the loudspeaker during the 2A Championship Game was government speech. If so, these claims necessarily fail because "[t]he Free Speech Clause restricts government regulation

18

of private speech; it does not regulate government speech." Pleasant Grove City v. Summum, 555 U.S. 460, 467 (2009). Alternatively, the trial court concluded that even if the public-address system was some type of forum for private speech, it was a nonpublic forum at best and the restriction it imposed was lawful.

We disagree with both conclusions. As we see it, there are simply too many key facts left undetermined at this preliminary stage and, when we draw all of the inferences as we must in Cambridge Christian's favor, we are left with a complaint that has plausibly stated a claim under the Free Speech Clause. "At the motion to dismiss stage, . . . we are not asking whether the complaints meet any probability requirement, only whether they plausibly allege violations" of the First Amendment. City of Miami v. Wells Fargo & Co., 923 F.3d 1260, 1265 (11th Cir. 2019). We conclude that Cambridge Christian has done so.

## A.

It is by now clear under the First Amendment that if all of the speech over the loudspeaker at the 2A Championship Game was government speech, Cambridge Christian's case could not proceed under the Free Speech Clause. "When the government exercises 'the right to speak for itself,' it can freely 'select the views that it wants to express.'" Mech v. Sch. Bd. of Palm Beach Cty., 806 F.3d 1070, 1074 (11th Cir. 2015) (quoting Summum, 555 U.S. at 467); see also id. ("Because characterizing speech as government speech 'strips it of all First

19

Amendment protection' under the Free Speech Clause, we do not do so lightly."

(citation omitted)).  While we lack "a precise test for separating government

speech from private speech," id., three leading cases -- two from the Supreme

Court and one decided by a panel of this Court -- have laid out a series of factors

that we are required to consider in the calculus: history, endorsement, and control.

Id. at 1074–75.

Pleasant Grove City v. Summum, 555 U.S. 460 (2009), was the first of these

cases.  There, a religious group petitioned a city mayor for permission to place a

stone monument proclaiming some of its religious beliefs in a city park where a

number of other monuments -- including one of the Ten Commandments -- had

stood for some time.  See id. at 465.  Some of these had been donated by private

groups.  Id. at 464–65.  The Court determined that the city was not required to

allow the proposed monument because "a permanent monument in a public park is

best viewed as a form of government speech and is therefore not subject to scrutiny

under the Free Speech Clause."  Id. at 464 (emphasis added).  This case, only a

decade old, was the first to consider the history of the medium, the implication of

government endorsement, and the degree of government control as foundational to

government speech analysis -- though these factors were not so cleanly identified

and delineated in their first appearance.  See id. at 470–72.  All three weighed

heavily in favor of finding that the monuments in the public park were a form of

20

government speech, notwithstanding that some had been privately funded and donated. See id.

In Walker v. Sons of Confederate Veterans, Inc., 135 S. Ct. 2239 (2015), the Court considered these factors again, this time concluding that "specialty license plates issued pursuant to [a state] statutory scheme" were also a form of government speech. Id. at 2246. The Sons of Confederate Veterans, Texas Division had applied to sponsor a specialty license plate in Texas, but the Texas Department of Motor Vehicles Board rejected their application and proposed design, which included a Confederate battle flag, because "members of the general public [found] the design offensive," and these views were reasonable since "a significant portion of the public associate the confederate flag with organizations advocating expressions of hate." Id. at 2245. The Court modeled its analysis of the state's license plates as government speech on its discussion in Summum, now drawing out and identifying precisely for the first time the three factors -- history, endorsement, and control -- and finding again that each of them pointed to the conclusion that the license plates were a form of government speech. Id. at 2248–49. As a result, the state could not be required to issue plates sponsored by the Sons of Confederate Veterans or featuring their proposed design. See id. at 2253. Those license plates would have been Texas's own speech, not the Confederates',

21

and it was, therefore, up to the state whether it would promote their organization through its license plates.

Most recently, a panel of this Court evaluated "banners on [public schools'] fences [recognizing] the sponsors of school programs." Mech, 806 F.3d at 1072. The plaintiff in Mech v. School Board of Palm Beach County, 806 F.3d 1070 (11th Cir. 2015), was a former adult film actor who had become a math tutor and who wanted the Palm Beach County School Board to hang a banner at three schools advertising his tutoring business and its sponsorship of school programs, alongside banners advertising other school sponsors. Id. at 1072–73. The School Board initially hung his banners, which complied with all the requirements of their sponsorship program, but removed them when they learned about Mech's previous career, citing "the educational mission" of the Board and their "community values." Id. at 1073. This prompted Mech to sue the school board under the Free Speech Clause. Id. We applied the factors employed by the Supreme Court in Walker and Summum to the banners. See id. at 1075–79. We determined that control and endorsement weighed in favor of government speech strongly enough that we were comfortable holding that the banners amounted to government speech, even in the absence of any evidence about the historical antecedent. See id.

22

Taking the facts in a light most favorable to Cambridge Christian, we find a history of private speech, and also that the allegations regarding control of speech delivered over the public address system paint an unclear picture. Because one of the three factors points toward finding that at least some private speech was disseminated over the public-address system and the control factor is mixed, we reverse the district court's threshold conclusion that the public-address system was used to convey only government speech, along with its dismissal of the Free Speech claims and remand for further exploration of the relevant facts.

## 1. History

The first factor -- history -- directs us to ask whether the type of speech under scrutiny has traditionally "communicated messages" on behalf of the government. Walker, 135 S. Ct. at 2248. In Summum, the Court observed that "[g]overnments have long used monuments to speak to the public." Summum, 555 U.S. at 470. Monuments on public land, even privately funded ones, were no different as far as this factor was concerned. See id. at 470–71. "Since ancient times," the Court said "kings, emperors, and other rulers have erected statues of themselves to remind their subjects of their authority and power," and today governments erect monuments "to convey some thought or instill some feeling in those who see the structure." Id. at 470. License plates, too, the Supreme Court said, had a well-recognized history of communicating messages from the states

23

that issued them, whether in graphics, slogans, or text.  Walker, 135 S. Ct. at 2248.

License plates had not been around as long as monuments, but the Court noted that

as early as 1917 states were displaying graphics on the plates they issued, and state

slogans had appeared on some plates since 1928.  Id.  Texas, specifically, had

employed both graphics and slogans over the years.  Id.  In Mech, we could find no

lengthy history surrounding banners being hung on school fences, but we observed

there that this factor was not determinative; "a long historical pedigree is not a

*prerequisite* for government speech."  Mech, 806 F.3d at 1076.

Here, the district court concluded that the history factor weighed against

finding that speech over the loudspeaker was government speech.  We agree

because the allegations in the complaint strongly suggest that the state has allowed

the dissemination of prayer over the public-address system in the past.  Thus, the

complaint tells us that University Christian told the FHSAA that they had been

allowed to pray over the loudspeaker before a 2012 championship game (only

three years earlier).  The complaint also recounts that Cambridge Christian prayed

before three 2015 playoff games leading up to the championship.  There is

significant uncertainty in the facts as pled.  The attestation that there was prayer

before the 2012 championship comes to us secondhand, and we do not know how

closely the FHSAA administered or monitored the early-round playoff games

hosted by Cambridge Christian at their home field.  The history presented in the

24

complaint may be inaccurate or unprovable, but we cannot say so with any confidence, and at this preliminary stage in the case we are required to view it in a light most favorable to Cambridge Christian. Thus, we are satisfied that Cambridge Christian has alleged enough for us to say that history plausibly weighs in favor of characterizing the speech over the loudspeaker as being, at least in part, private.

### 2. Endorsement

The second of the factors -- endorsement -- asks whether the kind of speech at issue is "often closely identified in the public mind with the government," Summum, 555 U.S. at 472, or put somewhat differently, whether "observers reasonably believe the government has endorsed the message," Mech, 806 F.3d at 1076. Monuments in public parks were identified with government because "parks are often closely identified in the public mind with the government unit that owns the land," and because "[i]t certainly is not common for property owners to open up their property for the installation of permanent monuments that convey a message with which they do not wish to be associated." Summum, 555 U.S. at 471, 472. And in Walker, "Texas license plates [were], essentially, government IDs," closely identified with the state because the government required them and regulated them for undeniably governmental purposes, and because every license plate had the word "TEXAS" stamped at the top. Walker, 135 S. Ct. at 2248–49.

25

Finally, in <u>Mech</u>, we concluded that the banners were also presumably government-endorsed because "schools typically do not hang [banners] on school property for long periods of time if they contain 'message[s] with which [they] do not wish to be associated.'" <u>Mech</u>, 806 F.3d at 1076 (quoting Walker, 135 S. Ct. at 2249). Moreover, the banners were all required to include the schools' initials and these critical words: "Partner in Excellence." <u>Id.</u>

The same logic that applies to the banners and the monuments applies here as well. While speech disseminated over a loudspeaker at an event plainly is more transient than any of our comparators -- statues, license plates, or banners -- it is tied to government spatially, in the same way the banners were tied to the schools and the monuments were tied to the city, because it occurs at a government-organized event. Just as we assumed that the owners of property do not generally put up banners or monuments that convey messages with which they disagree, so too we can safely assume that the organizers of a sporting event -- a league, a home team, or, in this case, the FHSAA -- generally would not allow a public-address system to be used to convey messages they didn't want to be associated with.

The state organized the game and likely would have been seen as endorsing any communication over the loudspeaker because, although the game was between two Christian schools, it was the Championship of Division 2A, a class of a league organized by the FHSAA. The heads of both schools referred to the weekend of

26

games as the "State Championships."  The public-address system was part of a stadium owned by the government (albeit a different level of government), and the announcer was a representative of the government.  The FHSAA's Public-Address Protocol emphasizes that he must "maintain complete neutrality."  The schools envisioned their own representatives actually leading the prayer over the loudspeaker, but the prayer would have come at the start of the game, around when the National Anthem and Pledge of Allegiance are traditionally performed (and were performed at this championship game).  These pre-game rituals in particular are inseparably associated with ideas of government.

The types of messages conveyed over the loudspeaker also suggest that observers would believe the government endorsed the messages conveyed over the loudspeaker.  As the district court noted: "Cambridge Christian does not allege that the loudspeaker was used during the championship game by anyone other than the public-address announcer, with the exception of the music played for the half time performances."  The Protocol does provide for the possibility of "Messages provided by host school management," but does not anticipate that host school management will make their own announcements.  (Nor was there a "host school" in the traditional sense at this championship game -- it was held at a neutral location.)  The Participant Manual likewise does not indicate any room for announcements other than by the FHSAA.

Advertisements over the public-address system might be relevant to any analysis of the endorsement factor but, at this point, we don't know much about them. All the complaint tells us is that messages were delivered by the FHSAA's public-address announcer.[3] The public-address protocol requires "complete neutrality" on the part of this announcer, who is designated as a "bench official." The Participant Manual also says that the announcer had a "pre-game script" which ran through the presentation of colors, the Pledge of Allegiance, the National Anthem, and the introduction of starters for each team. We think an announcer who guides the spectators through these processes, and who maintains neutrality while calling plays would have been closely associated in the minds of spectators with the FHSAA, so, absent further information, advertisements read by the announcer would also likely be perceived as government-endorsed. This might change if in the course of discovery, further details are developed about the ads. Thus, for example, we don't know if the ads were framed as "thank yous" or were presented in more promotional terms. See Mech, 806 F.3d at 1076–77 (finding this distinction relevant).

---

[3] The complaint also alleges that messages from corporate sponsors lined the perimeter of the field and were displayed on the "Jumbotron." These messages do not appear to be relevant because Cambridge Christian did not ask to pray by means of messages lining the field or by using the Jumbotron.

28

Cambridge Christian argues, nevertheless, that the endorsement factor weighs "strongly" in its favor, but that argument is unconvincing. It points to our statement that: "views do not become the state's views merely by being uttered at a state event on a state platform." Adler v. Duval Cty. Sch. Bd., 206 F.3d 1070, 1080 (11th Cir.) (en banc), vacated, 531 U.S. 801 (2000), reinstated, 250 F.3d 1330 (11th Cir. 2001) (en banc). But we said this in an Establishment Clause case, not a Free Speech case,[4] and in reference to "government speech" overall, not in an analysis of the endorsement factor. It is surely right that views don't become the state's merely because they are uttered on a state platform, but being uttered on a state platform certainly helps. The factors and analyses drawn from Summum, Walker, and Mech are the appropriate means of deciding whether views expressed on a state platform have become the state's. The more precise question on the endorsement factor is whether the speech would be "closely identified in the public mind with the government." Summum, 555 U.S. at 472. Thus, we think it would likely be so in this case. Cambridge Christian is free to develop more facts as the litigation proceeds, but, for now, the endorsement factor appears to us to weigh in favor of government speech.

---

[4] Adler asked whether it was permissible for student-initiated, student-led prayer (that was not reviewed by the School Board) to occur at a high school graduation. In Count I, Cambridge Christian is arguing, under a different clause, that the FHSAA was obligated to allow school-initiated, school-led prayer, during a different kind of event -- one that contained no other private speakers like local politicians or celebrities contributing their personal views.

### 3. Control

Finally, the control factor asks whether the relevant government unit "maintains direct control over the messages conveyed" through the speech in question. Walker, 135 S. Ct. at 2249. In Summum, the city had "rules governing the acceptance of artwork for permanent placement in city parks," requiring approval of the finished product or a model before any piece of art would be accepted. Summum, 555 U.S. at 472. Likewise, Texas expressly reserved "final approval authority" over all license plate designs and would reject designs inconsistent with how the state chose "to present itself and its constituency." Walker, 135 S. Ct. at 2249. Finally, Florida's schools both had approval authority and control over the banners' design, typeface, color, contents, size, and location, including mandating that the school's initials and the phrase "Partner in Excellence" appear on each banner. Mech, 806 F. 3d at 1078.

The FHSAA controlled physical access to the microphone, but, notably, whether it controlled the content of the speech that went out over the loudspeaker is far from established on the limited record we have. For one thing, we do not know who made the announcements before or during the game, or, indeed, who would have been allowed to do so had they asked. The Administrative Procedures do not tell us whether anyone other than the FHSAA announcer spoke over the loudspeaker. The Procedures suggest that the FHSAA did control what the

30

announcer could say, for instance by requiring neutrality and announcements of the starting lineup and forbidding "play-by-play," "color commentary," or criticism of schools, players, coaches, or officials. The Procedures also list a variety of announcements, and seem to imply that the FHSAA announcer would make them all, but they do not say for sure one way or the other. One type of announcement listed is "[m]essages provided by host school management." The use of "provided by" (as opposed to, say "made by") might imply that the FHSAA would control any such announcements, but we don't know how closely. Would school messages be reworded, censored, or sometimes rejected? Or would the FHSAA announcer simply read any statement provided by a host school? Since we don't know we must assume, in Cambridge Christian's favor, that the state's control was limited.

The Administrative Procedures are likewise silent when it comes to the halftime show, the one time that we know for a fact someone other than the announcer actually did control what went out over the loudspeaker. The complaint says that "each school was permitted to, and Cambridge Christian did in fact, take control of the loudspeaker while its cheerleaders performed a halftime show" and that the "cheerleading coach played music of the school's choosing from her smart phone over the loudspeaker." We have some reason to think that the government exerted some control, at least by means of placing time limitations (seven minutes

31

for each team) on the expression, but we can discern no indication of any meaningful control beyond that. Thus, we can find nothing in the Administrative Procedures or the Participant Manual to indicate whether the FHSAA reserved any right to reject a song or musical choice or that the participating schools could not play songs with, for example, explicitly religious or political messages. We also don't know what it means to "take control of the loudspeaker," and whether this entailed access to the microphone. Given the paucity of facts as pled that the FHSAA had any rules limiting the schools' halftime choices, we simply do not know if any limits were in place.

Although this final factor does not point clearly in either direction, the school's assertion that it "did not seek -- nor would it have accepted -- a circumstance in which the FHSAA would exercise control over its message" misconstrues the question. No case precedent says that the government must control every word or aspect of speech in order for the control factor to lean toward government speech. Cambridge Christian cites Johanns v. Livestock Marketing Association, 544 U.S. 550 (2005), as establishing otherwise, but this case says that control of every word is a sufficient, not a necessary condition, for government speech. See id. at 562 ("When, as here, the government . . . approves every word that is disseminated . . . ." (emphasis added)). A lack of control over every word is not determinative because complete control is not required.

32

\*    \*    \*

The long and the short of it is that we simply do not have enough information to say with any confidence that, if everything in the complaint is true, speech disseminated over the public-address system was and would have been government speech as a matter of law.  The history of prayer at past games, as alleged in the complaint, tilts the first factor against finding that speech presented over the loudspeaker was government speech, but the implicit endorsement of messages carried over the loudspeaker at a state event cuts the other way.  The allegations regarding the control factor point in both directions, at least at this point, and there are many key questions left unanswered by the very preliminary record now before us.  Since we cannot say, based on the complaint, that all communication over the loudspeaker during the 2A Championship Game was government speech, and since there are considerable facts alleged that yield a different conclusion, we reject the district court's first rationale for dismissing Cambridge Christian's Free Speech claim, and thus turn to the nature of the forum and the bases for the restrictions imposed by the State.

## B.

If some or all of the speech conducted over the loudspeaker at the 2015 2A Championship was not government speech, this necessarily means that at least some of it was private speech.  Our courts have employed a "'forum based'

33

approach for assessing restrictions that the government seeks to place on the use of its property" by private speakers. Int'l Soc'y for Krishna Consciousness, Inc. v. Lee, 505 U.S. 672, 678 (1992). This requires us to consider (1) what kind of forum the FHSAA created, (2) what type of restriction on access to the forum it enforced against Cambridge Christian, and, finally, (3) whether that restriction was constitutionally permissible. We conclude that the complaint plausibly alleged that the FHSAA created a nonpublic forum, that the FHSAA restricted Cambridge Christian's speech on the basis of its content, and that the restriction was unreasonable on account of the FHSAA's arbitrary and haphazard application of its policies.

1.

The first critical step in the analysis is to discern the nature of the forum at issue, namely the stadium's public-address system. Broadly, we have identified four types of government fora. See Barrett v. Walker Cty. Sch. Dist., 872 F.3d 1209, 1226 (11th Cir. 2017). Two of these may safely be eliminated from our consideration. Based on our review of the complaint, the FHSAA plainly did not create a traditional public forum. "In a traditional public forum -- parks, streets, sidewalks, and the like -- the government may impose reasonable time, place, and manner restrictions on private speech, but restrictions based on content must satisfy strict scrutiny, and those based on viewpoint are prohibited." Minn. Voters

34

All. v. Mansky, 138 S. Ct. 1876, 1885 (2018).  No one has suggested that the loudspeakers are a traditional public forum like a town square, and we may safely put this possibility aside.  We can also say with great confidence that we are not looking at a designated public forum.  These are "spaces that have 'not traditionally been regarded as a public forum' but which the government has 'intentionally opened up for that purpose,'" and in which it may not restrict speech any more than in a traditional public forum.  Id. (quoting Summum, 555 U.S. at 469–70).  It is clear that the loudspeakers were not intentionally opened for speech as widely as a public park.

Two options thus remain -- what is called a limited public forum[5] or a nonpublic forum.  A "'limited public forum' . . . exists where a government has 'reserv[ed a forum] for certain groups or for the discussion of certain topics.'"  Walker, 135 S. Ct. at 2250 (quoting Rosenberger v. Rector & Visitors of Univ. of Va., 515 U.S. 819, 829 (1995)).  Unlike a designated public forum, which "grants general access to the designated class," a limited public forum "can be set up to

---

[5] At times, this Court and the Supreme Court have said there are only three kinds of forums, leaving out the limited public forum. See, e.g., Minn. Voters All., 138 S. Ct. at 1885 ("Generally speaking, our cases recognize three types of government-controlled spaces: traditional public forums, designated public forums, and nonpublic forums."); Keeton v. Anderson-Wiley, 664 F.3d 865, 871 (11th Cir. 2011).  We do not take these general statements to imply that the concept of a limited public forum -- which the Supreme Court has invoked in recent cases that have not been overruled or abrogated -- is no longer good law. See Walker, 135 S. Ct. at 2250; Rosenberger, 515 U.S. at 829.  Whether the limited public forum is a distinct type or merely a variant of one of the other three is not important to our analysis.

35

grant only selective access to that class." Barrett, 872 F.3d at 1224 (quotation marks omitted). Thus, by way of example, we have identified the public-comment portions of school board meetings, among other things, as limited public forums. Id.; see also Widmar v. Vincent, 454 U.S. 263, 272 (1981) (university buildings open for meetings of student groups); Rowe v. City of Cocoa, 358 F.3d 800, 802 (11th Cir. 2004) (city council meetings); Crowder v. Hous. Auth. of City of Atlanta, 990 F.2d 586, 591 (11th Cir. 1993) (common area in a public housing building).

Finally, a nonpublic forum is a government "space that 'is not by tradition or designation a forum for public communication.'" Minn. Voters All., 138 S. Ct. at 1885 (quoting Perry Educ. Ass'n v. Perry Local Educators' Ass'n, 460 U.S. 37, 46 (1983)). A space where the state is acting only as "a proprietor, managing its internal operations," falls into this category. Walker, 135 S. Ct. at 2242 (2015). Examples include polling places, Minn. Voters All., 138 S. Ct. at 1886, the mailboxes of public school teachers, Perry Educ. Ass'n, 460 U.S. at 46, terminals in publicly operated airports, Int'l Soc. for Krishna Consciousness, 505 U.S. at 679, and military bases, Greer v. Spock, 424 U.S. 828, 838 (1976).

Cambridge Christian has not plausibly alleged that the FHSAA created anything more than a nonpublic forum. A state actor "does not create a public forum" -- limited or otherwise -- "by inaction or by permitting limited discourse,

36

but only by intentionally opening a nontraditional forum for public discourse."

Cornelius, 473 U.S. at 802.  The extent to which a forum is open to various

speakers "is relevant for what it suggests about the Government's intent in creating

the forum."  Id. at 805.  The complaint contains limited factual allegations that bear

on the distinction between a limited public forum and a nonpublic forum.  Of note,

the Public-Address Protocol tells us that the announcer may read some undefined

"[m]essages provided by host school management" over the loudspeaker; an

FHSAA official attested that at halftime the loudspeaker would "play a musical

selection provided by the school for that school's cheerleaders during their half-

time performance if that school does not have a band to play the musical

selection," apparently without any restriction or prescreening; and Cambridge

Christian alleges that pregame prayers were delivered through the public-address

system before FHSAA-governed playoff games on at least four prior occasions.

Our analysis is guided by the Supreme Court's resolution of this issue in a

remarkably similar factual context.  In Santa Fe Independent School District v.

Doe, 530 U.S. 290 (2000), the Court addressed the question whether a public high

school policy of permitting student-led, student-initiated prayers over a

loudspeaker system at the start of football games violated the Establishment

Clause.  There, the Court concluded that it was "clear" that the public-address

system at the stadium was not a limited public forum.  Id. at 303.  The Court noted

that the school did "not evince either by policy or by practice, any intent to open the pregame ceremony to indiscriminate use by the student body generally." Id. (quotations omitted and alterations adopted). Instead, "the school allow[ed] only one student . . . to give the invocation," and because the student was selected by a majority vote, minority views would be "effectively silenced." Id. at 303–04. As the Court explained, "the extremely selective access of the policy and other content restrictions confirm[ed] that it [was] not a content-neutral regulation that create[d] a limited public forum for the expression of student speech." Id. at 315. Here, access appears to be similarly limited to -- at most -- the two participating schools, and we think it is doubtful that the FHSAA intended to create any kind of forum for the expression of private speech in any broad sense. Nothing in the complaint suggests that the loudspeaker system was open to "indiscriminate use" by the student body, the public at large, or any other broad population of speakers. And no "minority views" would be heard in this forum either, since only the schools were empowered to provide any messages. As in Santa Fe, then, this forum appears not to be a limited public forum.

Indeed, in Santa Fe the Court observed that in a previous decision, Perry Education Ass'n v. Perry Local Educators' Ass'n, 460 U.S. 37 (1983), it held that an interschool mail system that "allowed far more speakers to address a much broader range of topics" was also only a nonpublic forum. Santa Fe Indep. Sch.

38

Dist., 530 U.S. at 303 (emphasis added).  In Perry, a union seeking to represent public school teachers challenged a policy barring it from using the interschool mail system and accessing teachers' individual mailboxes.  Perry Educ. Ass'n, 460 U.S. at 39–41.  The union argued that the mail system was a limited public forum because there was "periodic use of the system by private non-school connected groups" and because the union previously had unrestricted access.  Id. at 47.  The Court rejected these arguments, finding that "there [was] no indication in the record that the school mailboxes and interschool delivery system [were] open for use by the general public," that the school principals' permission was required for all outsiders to use the system, and that the record did not show that permission was granted "as a matter of course."  Id. at 47.  Outside organizations like the YMCA, Cub Scouts, and other civic and church organizations could use the system, but this was only "selective access" that was not enough to make the forum "public" in any sense.  Id.; see also Cornelius v. NAACP Legal Def. & Educ. Fund, Inc., 473 U.S. 788, 805 (1985) (holding that a charitable fundraising drive conducted in a federal workplace was a nonpublic forum).

Cambridge Christian argues, nevertheless, that the FHSAA created a limited public forum by "opening the Stadium facilities up to private speech, including using the loudspeaker for school messages and halftime shows and use of other Stadium facilities for other messages."  Cambridge Christian is correct that the

39

complaint shows that the loudspeaker system was open, at least to some extent, to private, nongovernment speakers. However, the complaint says precious little to create the inference that the FHSAA intended to open the loudspeaker to a broad range of discourse by private speakers. Discourse is the "verbal interchange of ideas." Webster's Third New International Dictionary 647 (2002). Allowing the schools to play music over the loudspeaker at halftime and to provide some kind of messages, presumably of an informational nature, does not suggest that the FHSAA intended to create a forum for the free expression of ideas by members of the public more broadly. Moreover, the loudspeaker was accessible by at most two private speakers, for what appear to be limited purposes, that is, to facilitate the standard ceremonial accompaniments to a high school football game. This "type of selective access" identified by Cambridge Christian does not "transform government property into a public forum," limited or otherwise. Perry Educ. Ass'n, 460 U.S. at 47; see also Sentinel Commc'ns Co. v. Watts, 936 F.2d 1189, 1204 (11th Cir. 1991) ("[T]he practice of allowing some speech activity on [government] property does not amount to the dedication of such property to speech activities.").

Cambridge Christian cites only to Rosenberger v. Rector & Visitors of University of Virginia, 515 U.S. 819 (1995), in support of its claim that the

40

FHSAA had created a limited public forum.[6]  Rosenberger, however, involved a program by a public university that provided funds for a broad array of student groups to pay third-party contractors for certain expenses.  Id. at 824–25.  A group established "[t]o publish a magazine of philosophical and religious expression" from a Christian perspective was denied funding to pay printing costs on the grounds that the group engaged in "religious activit[ies]."  Id. at 825–26.  The Supreme Court concluded that the funding program in effect created a limited public forum.  Id. at 829.

Undeniably, that forum was much more open than the loudspeaker at the state championship game.  In fact, the funding program created by the University of Virginia could be used by "any group the majority of whose members are students, whose managing officers are fulltime students, and that complies with certain procedural requirements," id. at 823, although funds were not provided for certain kinds of activities and expenses, id. at 825.  The record showed that 343

---

[6] It is not at all clear to us that Cambridge Christian has adequately preserved this argument.  In its opening brief, Cambridge Christian raised the issue in only one short, conclusory sentence in a footnote.  That sentence reads, "It bears noting, however, that upon opening the Stadium facilities up to private speech, including using the loudspeaker for school messages and halftime shows and use of other Stadium facilities for other messages, the FHSAA created a limited public forum. See Rosenberger, 515 U.S. at 829."  Opening Br. at 30 n.7.  We have repeatedly held that "[a] party fails to adequately 'brief' a claim when he does not 'plainly and prominently' raise it, 'for instance by devoting a discrete section of his argument to those claims.'"  Sapuppo v. Allstate Floridian Ins. Co., 739 F.3d 678, 681 (11th Cir. 2014) (quoting Cole v. U.S. Att'y Gen., 712 F.3d 517, 530 (11th Cir. 2013)).  A solitary "passing reference[]"in a footnote in a section of the brief dedicated to a different argument likely fails to meet that standard.  Id.  at 682.  In any event, assuming that the citation to Rosenberger was enough to preserve the issue, we reject Cambridge Christian's argument.

student groups qualified to participate in the program in the relevant academic year, 135 applied for funds from the program, and 118 received funding. Id. Groups receiving funding included the Muslim Students Association, the Jewish Law Students Association, the C.S. Lewis society, and fifteen publications covering various topics like politics, literature, and environmental law. See Rosenberger v. Rector & Visitors of Univ. of Va., 18 F.3d 269, 271 & n.3 (4th Cir. 1994), rev'd, 515 U.S. 819. Access to this forum was therefore much broader and generally available than the forum involved here, which at most two private parties could access. The complaint does not allege that the loudspeaker was generally accessible to members of the public, nor does it say that participating schools were entitled to use it as a matter of course however they chose. We conclude that the complaint has plausibly alleged only a nonpublic forum and no more.

## 2.

That brings us to consider the nature of the FHSAA's restriction on Cambridge Christian's speech. Speech in a nonpublic forum can be restricted in order to preserve the forum "for its intended purposes, communicative or otherwise, as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view." Minn. Voters All., 138 S. Ct. at 1885. Indeed, the government has "much more flexibility to craft rules limiting speech" in a nonpublic forum than in any other

42

kind of forum.  Id.  But it is equally clear that "nonpublic forum status 'does not mean that the government can restrict speech in whatever way it likes.'"  Ark. Educ. Television Comm'n v. Forbes, 523 U.S. 666, 682 (1998) (quoting Int'l Soc'y for Krishna Consciousness, 505 U.S. at 687).  Thus, it remains true that even in a nonpublic forum, any barrier to access or restriction on speech must be viewpoint neutral, Christian Legal Soc'y, 561 U.S. at 679, and it cannot be exercised in an arbitrary and haphazard manner, Minn. Voters All., 138 S. Ct. at 1888.

The prohibitions on content and viewpoint discrimination are "distinct but related limitations that the First Amendment places on government regulation of speech."  Reed v. Town of Gilbert, 135 S. Ct. 2218, 2229–30 (2015).  A "regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed."  Id. at 2227.  Viewpoint discrimination is "an egregious form of content discrimination" that occurs "when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the regulation."  Rosenberger, 515 U.S. at 829.,  In other words, a "content-based regulation either explicitly or implicitly presumes to regulate speech on the basis of the substance of the message," while a "viewpoint-based law goes beyond mere content-based discrimination and regulates speech based upon agreement or disagreement with the particular position the speaker wishes to

express." 1 Smolla & Nimmer on Freedom of Speech § 3:9 (2019). So to distinguish between viewpoint and content discrimination, we must determine whether the speech restriction was based on "the specific motivating ideology" or particular position of the speaker, or "the topic discussed" or the substance of the message more generally.

Because there is little reason to think from the complaint and the limited record before us that the FHSAA would have allowed prayer from one religious sect but not from another, or that it would have allowed some solemnizing messages but would not have allowed a similar message from a religious viewpoint, we think the FHSAA's restriction amounts to a restriction based on content, not on viewpoint.

The complaint tells us that the FHSAA's explanation for denying access to the loudspeaker focused on the religious nature of the message Cambridge Christian proposed to deliver. After the schools asked for permission, the FHSAA's first responsive email suggested that its decision was shaped by a desire to keep government and religion separate. The FHSAA's Executive Director observed that "both schools are private and religious-affiliated institutions" and said that "the fact that the facility is a public facility, predominantly paid for with public tax dollars, makes the facility 'off limits' under federal guidelines and precedent court cases." The Director also asserted that the FHSAA could not

44

"legally permit or grant permission for such an activity" because it is a state actor. While the First Amendment or the religion clauses are not specifically mentioned in the first email, the implication is clear enough that the religious nature of the message was the main concern.

Two days after the game, the Director of the Florida High School Athletic Association sent a second email explaining in greater detail the basis for its decision. This time he referenced the religious content of the proposed speech explicitly:

> The issue is commonly referred to as the "separation of church and state." The First Amendment to the United States Constitution contains a provision that prohibits the government from 'establishing' a religion. . . . [C]ourts have interpreted this provision to generally mean that the government may not engage in activities that can be viewed as endorsing or sponsoring religion. For example, in 2000, the U.S. Supreme Court told a Texas high school that it cannot allow its football team members to lead a prayer on the field before the start of the game where the school allowed the team to use the stadium's PA system to broadcast the prayer to the spectators. While no school employee was involved in the actual prayer, the Court said the school gave the impression that it was endorsing the prayer by allowing the use of its PA system and allowing the prayer as part of the pre-game ceremonies.

The email concluded that since the FHSAA "is determined to be a 'State Actor' by the Florida courts," the organization could not have granted Cambridge Christian's request without running afoul of Santa Fe Independent School District v. Doe, where the Supreme Court held that a public school district's policy of permitting student-led, student-initiated prayers over a loudspeaker system at the start of

45

football games violated the Establishment Clause.[7]  See 530 U.S. at 301–17.  As

the FHSAA saw it, "[t]he issue was . . . that an organization, which is determined

to be a 'state actor,' cannot endorse nor promote religion."  It further explained that

"prayer, in and of itself, was not denied to either team or to anyone in the stadium,"

it just could not be conducted over the loudspeaker.

　　　Cambridge Christian argues that its request was denied because of the

religious perspective of its speech, which makes the FHSAA's decision viewpoint

discrimination, but we disagree.  The line between viewpoint and content

discrimination is admittedly "not a precise one," Rosenberger, 515 U.S. at 831, and

that is particularly true when it comes to restrictions on religious speech.  But

---

[7] Despite the similar, although not identical, facts concerning prayer before a football game, Santa Fe does not enable us to resolve the entire case at this stage in the proceedings.  For one thing, it was presented to the courts under the Establishment Clause, as a challenge to prayers that were allowed, and indeed encouraged, by the state.  Cambridge Christian's challenge is to the denial of a request for prayer and is primarily brought under the Free Speech and Free Exercise Clauses.

We have no occasion today to decide the hypothetical case that would have arisen had the FHSAA allowed the prayer and faced a suit under the Establishment Clause.  See infra Part V.  In theory and in practice, the Free Exercise and Establishment Clauses are sometimes found in some tension with one another, but "there is room for play in the joints between them." Locke v. Davey, 540 U.S. 712, 718 (2004) (quotations omitted).  "Justice Goldberg cogently articulated the relationship between the Establishment Clause and the Free Exercise Clause when he said that '[t]he fullest realization of true religious liberty requires that government . . . effect no favoritism among sects . . . and that it work deterrence of no religious belief.'" Ray v. Comm'r, Ala. Dep't of Corr., 915 F.3d 689, 695 (11th Cir.) (quoting Sch. Dist. of Abington Twp. v. Schempp, 374 U.S. 203, 305 (1963) (Goldberg, J., concurring)), vacated on other grounds, Dunn v. Ray, 139 S. Ct. 661 (2019).  Most significantly, as we explain infra in Part III.B.3, Cambridge Christian's complaint plausibly alleged that the state arbitrarily and haphazardly denied prayers on some occasions but allowed them before at least four prior playoff games for no apparent reason.  This consideration, however, played no role in Santa Fe.

46

based on the facts alleged in Cambridge Christian's complaint, the FHSAA's

restriction falls decidedly on the content side of the line. It is clear that the

FHSAA relied on the nature of the proposed message as a prayer when it decided

not to grant the schools' request. The FHSAA did not simply say "no messages

from the schools are permitted," or "only the public-address announcer is

permitted to use the loudspeaker," or "no Christian messages are allowed"; instead,

the FHSAA said, in effect, "no prayer, of any kind, at the outset of the football

game." That is a restriction on speech "based on the substantive content or the

message it conveys," in other words, a content-based restriction. Rosenberger, 515

U.S. at 828. The complaint does not allege, for instance, that Christian prayer was

prohibited but that Jewish or Muslim prayer would have been allowed, which

would present an obvious case of viewpoint discrimination. We proceed, then, on

the theory that the complaint has plausibly alleged that the FHSAA's restriction

was based on the content of the message as a prayer, not the schools' religious

viewpoint.[8]

---

[8] We do not rule out the possibility that discovery might reveal that the FHSAA barred the schools from speaking because the prayer would have expressed an impermissibly religious viewpoint on a topic that was included in the ambit of the forum and could otherwise have been discussed in a nonreligious way. Thus, for example, if a secular act of solemnization or invocation of some sort would have been permitted by the state at the outset of the game, Cambridge Christian's case for discrimination against a religious viewpoint would be stronger. See Rosenberger, 515 U.S. at 831 (explaining that excluding "a theistic . . . perspective" from a forum is impermissible, just like excluding any other "political, economic, or social viewpoint"); Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist., 508 U.S. 384, 393 (1993) (holding that

3.

Having concluded that the complaint plausibly alleged that the forum was likely a nonpublic one and that the FHSAA's restriction was likely content based, the final step in our analysis is to examine the restriction for reasonableness. This is a "forgiving test." Minn. Voters All., 138 S. Ct. at 1888. "The reasonableness of the Government's restriction of access to a nonpublic forum must be assessed in the light of the purpose of the forum and all the surrounding circumstances." Cornelius, 473 U.S. at 809. "Although there is no requirement of narrow tailoring in a nonpublic forum, the State must be able to articulate some sensible basis for distinguishing what may come in from what must stay out." Minn. Voters All., 138 S. Ct. at 1888.

The Supreme Court has made it clear that even in a nonpublic forum the government must avoid the haphazard and arbitrary enforcement of speech restrictions in order for them to be upheld as reasonable. Thus, for example, in Minnesota Voters Alliance v. Mansky, 138 S. Ct. 1876 (2018), the Supreme Court invalidated a state law prohibiting voters from wearing certain kinds of expressive clothing and accessories inside the polling place. The Minnesota law at issue prohibited voters from wearing any "political badge, political button, or other

excluding speech "dealing with the subject matter from a religious standpoint" is viewpoint discrimination). Nothing in the complaint, however, suggests that the state's restriction was imposed on the basis of viewpoint, rather than content.

48

political insignia." Id. at 1883. The Court determined that the polling place was a nonpublic forum, that the law did not facially discriminate on the basis of viewpoint, and that it was reasonable for the State to determine that "some forms of advocacy should be excluded from the polling place, to set it aside as 'an island of calm in which voters can peacefully contemplate their choices.'" Id. at 1886, 1887. But the Court determined that the law still failed the reasonableness test because the ban on "political" apparel was too indeterminate and haphazardly applied. Id. at 1888; see also id. at 1891 ("A shirt simply displaying the text of the Second Amendment? Prohibited. But a shirt with the text of the First Amendment? It would be allowed.").

The complaint has plausibly alleged that the FHSAA's prohibition on prayer at the 2015 championship game had a similar substantial defect -- the restriction was arbitrarily and haphazardly applied by the state. "[A] challenged regulation may be unreasonable, regardless of the reasons for its adoption, if it is inconsistently enforced." Archdiocese of Wash. v. Wash. Metro. Area Transit Auth., 897 F.3d 314, 330 (D.C. Cir. 2018); see also Seattle Mideast Awareness Campaign v. King County, 781 F.3d 489, 500 (9th Cir. 2015) (finding a speech restriction reasonable because it was "sufficiently definite and objective to prevent arbitrary or discriminatory enforcement"); Kincaid v. Gibson, 236 F.3d 342, 355

(6th Cir. 2001) (en banc) (holding that speech restrictions "were not reasonable because they were arbitrary").

Notably, Cambridge Christian has alleged that the two participating teams, University Christian and Dade Christian School, were allowed to pray before the 2012 championship game administered by the FHSAA and that it prayed over the loudspeaker during the first three rounds of the 2015 playoffs before games conducted under the auspices of the FHSAA. In sharp contrast, the complaint tells us that in the 2015 championship game, while Cambridge Christian and University Christian could provide some "messages" of some undefined character, they could not deliver a prayer. The only explanation for the new restriction offered by the FHSAA was that prayer was not permitted by the Establishment Clause and the Supreme Court's decision in Santa Fe, but both of these were on the books when prayer was allowed in the championship game in 2012 and again in the first three playoff rounds in 2015. The FHSAA hasn't told us why this explanation barred speech at the 2015 championship game when it didn't bar the high schools from offering the same form of speech at three earlier semifinal games and one final game. Cf. Searcey v. Harris, 888 F.2d 1314, 1322 (11th Cir. 1989) (holding that a speech restriction put in place by a school board was unreasonable, in part because there was "no evidence which even arguably explain[ed] the Board's change in position"). In Searcey, a panel of this Court found it illuminating that a particular

kind of speech -- discussion of a career path by individuals who are no longer employed in the field at a Career Day event -- had been previously allowed in the same forum.  Id. at 1321–22 (noting that the new regulation would bar some "individuals [who]  have participated in the past" and questioning whether the new "present affiliation" policy was a reasonable content restriction).  Permitting certain speech on Monday, Tuesday, Wednesday, and Thursday and barring precisely the same message on Friday without any credible explanation of what may have changed is the essence of arbitrary, capricious, and haphazard -- and therefore unreasonable -- decisionmaking.

Moreover, the Supreme Court has observed that "[a] restriction on speech is 'reasonable' when 'it is wholly consistent with the [government's] legitimate interest in 'preserv[ing] the property . . . for the use to which it is lawfully dedicated.'"  Perry Educ. Ass'n, 460 U.S. at 50–51 (quoting U.S. Postal Serv. v. Council of Greenburgh Civic Ass'ns, 453 U.S. 114, 130 (1981)).  We cannot say with any reasonable confidence that barring the schools' speech was "wholly consistent" with preserving the purpose of the forum.  The FHSAA tells us that the purpose of the public-address system is "to facilitate a state actor conducting the championship games for the varying divisions."  Answer Br. at 27.  But that is not evident from the complaint itself, and nowhere does the FHSAA tell us why barring the school's message is necessary to or even consistent with this purpose.

51

We know that some pregame solemnizing messages of a different sort -- the presentation of colors, Pledge of Allegiance, and the National Anthem -- were considered appropriate for the forum.  And we know that the FHSAA saw no problem with the teams praying together at the 50-yard line before the game began. Most significantly, the fact that prayers were previously allowed over the loudspeaker plausibly suggests that the FHSAA did not consider them to be in conflict with the purpose of the forum, or at least that they were not in conflict on four prior occasions.  See Searcey, 888 F.2d at 1323.

We also find some guidance in Justice O'Connor's opinion in International Society for Krishna Consciousness, Inc. v. Lee, 505 U.S. 830 (1992).  As relevant here, the Supreme Court struck down a ban on the distribution of written material in airport terminals, though no single rationale commanded a majority of the Court.[9]  Id.  In a separate opinion, Justice O'Connor concluded that the restriction

---

[9] Five Justices, including Justice O'Connor, voted to strike down the leafletting prohibition, but her opinion was the only one to hold that the terminal was a nonpublic forum and that the restriction was invalid.  The four Justices concurring in the judgment concluded that an airport terminal was a public forum and that the restriction could not pass muster under that more demanding standard.  See Int'l Soc'y for Krishna Consciousness, 505 U.S. at 703 (Kennedy, J., concurring in the judgments).  The four dissenting Justices agreed with Justice O'Connor that an airport terminal is a nonpublic forum but would have upheld the restriction on distributing literature as reasonable.  This Court has previously observed that "the precise holding of Lee as to the ban on the sale of literature is unclear."  ISKCON Miami, Inc. v. Metro. Dade Cty., 147 F.3d 1282, 1287 (11th Cir. 1998).  At least two of our sister circuits have expressly identified Justice O'Connor's opinion as controlling, since it arguably provided the narrowest grounds for the decision.  See Hotel Emps. & Rest. Emps. Union, Local 100 v. City of N.Y. Dep't of Parks & Recreation, 311 F.3d 534, 556 (2d Cir. 2002); New England Reg'l Council of Carpenters v. Kinton, 284 F.3d 9, 20 (1st Cir. 2002); see also Marks v. United States, 430 U.S. 188, 193 (1977)

on leafletting in the nonpublic forum of an airport terminal could not withstand reasonableness review. Id. at 685 (O'Connor, J., concurring and concurring in the judgment). Justice O'Connor began by looking to the purpose of the forum. She noted that activity in the airport terminal was not tightly constrained to "facilitating air travel," since the terminal included shops, restaurants, banks, private clubs, and other ancillary establishments. Id. at 688–89. The question, then, was whether the ban on distributing literature was "reasonably related to maintaining the multipurpose environment that the Port Authority has deliberately created." Id. at 689. Justice O'Connor concluded that it was not, for two primary reasons: there was nothing inherent to leafletting that was "naturally incompatible" with the forum, and the defendant never offered "any justifications or record evidence to support its ban on the distribution of pamphlets" in the absence of intrusive solicitation. Id. at 690–91.

Here too, we lack any "explanation as to why [Cambridge Christian's] speech is inconsistent with the intended use of the forum," id. at 691–92, when we know both that some private, albeit indeterminate, messages can be read over the public-address system and that time is set aside for other ceremonial proceedings at

("When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds . . . ." (quotation marks omitted)). Even if Justice O'Connor's opinion is not binding law, we rely on it as persuasive authority.

the outset of the game.  And we further know that the schools are free to perform a halftime show orchestrated to music and dance without any restriction on content, even if the halftime show is religious in nature.

The schools' message does not appear to be "naturally incompatible" with the purposes of the forum -- we know that prayers were delivered on four prior occasions, presumably without incident, that undefined messages may be presented by the schools, and that the schools had considerable leeway in presenting their halftime shows -- and at this preliminary stage of the litigation we lack any record evidence to explain the FHSAA's restriction.  The FHSAA's explanation -- that it wanted to comply with the Establishment Clause and the Supreme Court's decision in Santa Fe -- might have been reasonable in a vacuum, but that does not explain why the restriction was enforced in an inconsistent manner.  As the case moves forward, the FHSAA may produce some reasoned explanation for its new-found position or other support for the reasonableness of its actions, but, based solely on the complaint and the attached exhibits, we think Cambridge Christian has plausibly alleged otherwise.  "We cannot infer the reasonableness of a regulation from a vacant record."  Searcey, 888 F.2d at 1322.  Even if a bar on any speech by the schools or anyone other than the public-address announcer could reasonably serve the purpose of orderly administering the game and providing for the usual sorts of pregame ceremony, the allegation that the prohibition has been enforced

54

inconsistently on at least four recent occasions is sufficiently troubling to allow this free speech case to progress to discovery.

We do not foreclose that a court may later conclude on a fuller record that any message delivered over the loudspeaker was government speech or that the restriction was reasonable. The only question we face today is whether Cambridge Christian "has said enough to make out a plausible case -- not whether it will probably prevail." City of Miami, 923 F.3d at 1264. All that we conclude now is that Cambridge Christian has plausibly alleged that the FHSAA violated its free speech rights under the First Amendment.

IV.

Cambridge Christian also lodged three claims against the Florida High School Athletic Association relating to the free exercise of religion -- one under the Free Exercise Clause of the U.S. Constitution, one under the corresponding clause found in the Florida Constitution,[10] and one pursuant to the Florida Religious Freedom Restoration Act (FRFRA), Fla. Stat. § 761.03. While the analysis under the Free Exercise Clauses is identical, FRFRA is slightly different. See Warner v. City of Boca Raton, 887 So.2d 1023, 1030 (Fla. 2004) (noting that although the Florida Supreme Court had not squarely analyzed the question, other Florida courts

---

[10] See supra note 2.

55

had treated the Free Exercise Clauses under the Florida and federal constitutions as "coequal").

The Free Exercise Clauses require a plaintiff to allege a religious belief and a burden that has been placed by the government on the exercise of that belief. To plead a claim for relief under the Free Exercise Clauses of the U.S. and Florida Constitutions, a plaintiff "must allege that the government has impermissibly burdened one of [its] 'sincerely held religious beliefs.'" Watts v. Fla. Int'l Univ., 495 F.3d 1289, 1294 (11th Cir. 2007). This belief must be "rooted in religion," since "personal preferences and secular beliefs do not warrant the protection of the Free Exercise Clause." GeorgiaCarry.Org, Inc. v. Georgia, 687 F.3d 1244, 1256 (11th Cir. 2012) (quoting Frazee v. Ill. Dep't of Emp't Sec., 489 U.S. 829, 833 (1989)). We have read this pleading requirement as having two components: "(1) the plaintiff holds a belief, not a preference, that is sincerely held and religious in nature, not merely secular; and (2) the law at issue in some way impacts the plaintiff's ability to either hold that belief or act pursuant to that belief." Id. at 1256–57 (citing Church of the Lukumi Babalu Aye v. City of Hialeah, 508 U.S. 520, 532 (1993)).[11]

---

[11] We note that under the Free Exercise Clause, there is an important distinction drawn between laws that are "neutral and generally applicable without regard to religion" and those that "single out the religious for disfavored treatment." Trinity Lutheran Church of Columbia, Inc. v. Comer, 137 S. Ct. 2012, 2020 (2017). The FHSAA has not claimed that their policy barring the schools' prayer was neutral and generally applicable -- and for good reason, since reading the complaint

As for the first prong -- a sincere religious belief that rises above the level of a preference -- Cambridge Christian's pleading is worded less directly than it might have been, but it conveys enough for us to discern a sincere belief in the importance of communal pre-game prayer. The school pled that it has a "clearly defined religious mission" and that "[s]tudent prayer is an integral component of [that] mission": prayer "is offered throughout the school year at, among other events, chapel services, parent and student gatherings, as well as prior to meals, around the flag pole, and to commission students, faculty, staff, administrators, buildings, and student trips and missions." Several of these "events" could necessitate communal prayer of some sort. Moreover, the school's athletic department "has its own mission statement," which incorporates religious elements, although it does not mention prayer specifically. Prayer before football games is part of a "long-standing tradition" at the school, going back "decades." These prayers are "given using the loudspeaker at all home games and at away games when possible." "Using the loudspeaker is important to Cambridge Christian's tradition of prayer because it allows the Cambridge Christian community to come together in prayer. In most sports venues, this union of students, parents, faculty, administration, coaches, and fans in prayer is not

---

in Cambridge Christian's favor shows that the decision to deny the schools' request was based at least in part on religion. As a result, we have no occasion to address this issue today.

57

possible without the use of the loudspeaker because the venues are too large for a human voice to be heard, without amplification, throughout the entire venue." At football games, the size of the typical venue means that the school "cannot engage in a community prayer without the use of a loudspeaker."

What's clear from this pleading is that communal pre-game prayer is an important part of Cambridge Christian's religious belief system. The harder question is whether it is more than a preference and rises to the level of a sincerely held belief. As the record now stands, we think the school has said enough to plausibly suggest that it does. What constitutes a "sincerely held belief" is not a probing inquiry, and "courts have rightly shied away from attempting to gauge how central a sincerely held belief is to the believer's religion." Watts, 495 F.3d at 1295. The Supreme Court itself has "consistently refused to 'question the centrality of particular beliefs or practices to a faith, or the validity of particular litigants' interpretations of those creeds.'" Ben-Levi v. Brown, 136 S. Ct. 930, 934 (2016) (Alito, J., dissenting from denial of certiorari) (quoting Employment Div., Dep't of Human Resources of Ore. v. Smith, 494 U.S. 872, 887 (1990)). It has said that such assessments generally are "not within the judicial ken," Hernandez v. C.I.R., 490 U.S. 680, 699 (1989); it has admonished us to "not undertake to dissect religious beliefs . . . because [the] beliefs are not articulated with . . . clarity and precision," Thomas v. Review Bd. Of Indiana Employment Security Div., 450

U.S. 707, 715 (1981); and it has reminded us that "the guarantee of the Free Exercise Clause . . . is 'not limited to beliefs which are shared by all of the members of a religious sect,'" Holt v. Hobbs, 135 S. Ct. 853, 863 (2015) (quoting Thomas, 450 U.S. at 715-16). And in Hobby Lobby, Justice Alito, writing for the Court, noted that it was "not for [the Court] to say that [the litigant's] religious beliefs are mistaken or insubstantial"; rather, the Court's "'narrow function . . . in this context is to determine' whether the line drawn reflects 'an honest conviction.'" Burwell v. Hobby Lobby Stores, Inc., 573 U.S. 682, 725 (2014) (quoting Thomas, 450 U.S. at 716).

The hesitation of courts to drill too far down into "belief" and "sincerity" is well justified. The line between "belief" and "practice" or "custom" is a murky one, and a searching judicial inquiry into "sincerity" is a difficult proposition. Cf. Hobby Lobby Stores, Inc., 573 U.S. at 710 ("[T]he 'exercise of religion' involves 'not only belief and profession but the performance of (or abstention from) physical acts' that are 'engaged in for religious reasons.'"); Gillette v. United States, 401 U.S. 437, 457 (1971) ("[W]e must also recognize that 'sincerity' is a concept that can bear only so much adjudicative weight."). In short, "courts must not presume to determine the place of a particular belief in a religion or the plausibility of a religious claim." Watts, 495 F.3d at 1295 (quoting Smith, 494 U.S. at 887).

59

What we can say with confidence is that communal prayer practices <u>may</u> be so important as to rise to the level of "belief." For instance, in Judaism, certain prayers <u>require</u> the presence of at least ten persons, known as a "minyan." <u>See</u> <u>Midrash Sephardi, Inc. v. Town of Surfside</u>, 366 F.3d 1214, 1221 (11th Cir. 2004). "A <u>central tenet</u> of Orthodox Jewish faith requires daily prayers and the presence of a 'minyan' -- a quorum of ten males over the age of thirteen -- for the reading from the Torah on the weekly Sabbath and religious holidays." Id. (emphasis added). The communal nature of the prayer is a condition precedent to the prayer itself. We also know generally that communal prayer is deeply rooted in religious traditions the world over. Christians in particular have been engaging in communal prayer and ritual since the first century. <u>See</u> VALERIY A. ALIKIN, THE EARLIEST HISTORY OF THE CHRISTIAN GATHERING: ORIGIN, DEVELOPMENT AND CONTENT OF THE CHRISTIAN GATHERING IN THE FIRST TO THIRD CENTURIES 285-86 (2010) ("Originally, the first part of the gathering was the Lord's Supper or Eucharist; it consisted of a communal meal, preceded by a prayer of thanksgiving and the drinking of wine. The second part of the gathering comprised the reading aloud of authoritative literary compositions, teaching, preaching, the passing on of revelations, singing, prayer, acclamations and other ritual actions.").

Communality, then, may not just be incidental, but rather central to the ability to pray. Put differently, the communal nature of the prayer may be just as

60

important as the prayer itself.  We are reluctant to say on so limited a record that communal prayer was not for these litigants a sincerely held religious belief where the little we do have in the complaint suggests that communal prayer was exceedingly important to them.  We fully appreciate, as already explained, that courts will not probe too deeply into the sincerity with which a plaintiff holds a particular belief, or the centrality of that belief to the plaintiff's religion.  Even so, we think that discovery may well shed light on the determination whether communal pre-game prayer is indeed a protected "belief" rather than a mere "preference."

To be clear, the fact that Cambridge Christian does not use the word "belief" when describing the centrality of communal prayer to its spiritual community is not determinative at the motion to dismiss stage.  In Watts v. Florida International University, 495 F.3d 1289 (11th Cir. 2007), this Court asked, rhetorically, "How do you plead sincerity of belief?  One way is to state that the belief is, in fact, your religious belief."  Id. at 1296.  But, as we said, this is only one way of doing so.  Another way is to do what Cambridge Christian has done, to plead a longstanding practice and tradition that is unmistakably and closely tied to basic religious beliefs and which strongly implies an underlying belief which may be adduced with more particularity as the litigation proceeds.  We are satisfied that Cambridge Christian has plausibly pled a sincerely held religious belief.

The burden prong under the Free Exercise Clauses has also plausibly been fulfilled by Cambridge Christian's pleadings. Because the school was denied prayer over the loudspeaker, it was unable to engage in a communal prayer that united the team and the spectators. The teams on the field were able to pray together at the 50-yard line, but this does not necessarily stand in for prayer over a loudspeaker, because it is not the same thing as the communal prayer practice that Cambridge Christian described in its complaint, and which was denied. Accepting, as we must at this stage in the proceedings, that what was critical for Cambridge Christian was uniting the players and fans together in prayer, it does not jump off the page at us that there was a readily available alternative to accessing the loudspeaker system, given the size of the stadium. It may well be, as the FHSAA claims, that a bullhorn or prayer cards would have sufficed, but we are reluctant to make that determination at this early stage. It is not at all obvious to us that a bullhorn or prayer cards would unite the players, coaches, and fans in communal prayer inside a large football stadium, although further development of the record may show otherwise. Accordingly, we reverse the district court's dismissal of the Free Exercise claims for failure to state a claim.

FRFRA is a different story. That law states that "[t]he government shall not substantially burden a person's exercise of religion, even if the burden results from a rule of general applicability," unless the government can identify that the burden

62

"(a) [i]s in furtherance of a compelling government interest; and (b) [i]s the least restrictive means of furthering that compelling interest."  Fla. Stat. § 761.03.

FRFRA requires showing that "[1] the government has placed a substantial burden on a practice [2] motivated by a sincere religious belief."  Warner v. City of Boca Raton, 887 So. 2d 1023, 1032 (Fla. 2004).  This may sound strikingly similar to the tests under the Free Exercise Clauses but the standards for each prong enunciated by the Florida Supreme Court -- which we are Erie-bound to follow as to the meaning of Florida law -- compel a different result here.

First, the belief prong of FRFRA is actually broader than the "sincerely held belief" standard under the Free Exercise Clauses.  Warner, 887 So. 2d at 1032 (noting that FRFRA's protections are "broader than United States Supreme Court precedent").  The statute defines "exercise of religion" as "an act or refusal to act that is substantially motivated by a religious belief, whether or not the religious exercise is compulsory or central to a large system of religious belief."  Fla. Stat. § 761.03.  The Florida Supreme Court has said that the statute's belief prong requires only that a plaintiff plead "a practice motivated by a sincere religious belief."  Warner, 887 So. 2d at 1032 (emphasis added).  Because we think Cambridge Christian has pled enough for the Free Exercise Clauses' belief prong, it necessary follows that it has adequately pled the first prong of a free exercise claim under FRFRA.

63

But the belief prong is not the end of the story because the Florida Supreme

Court has set a much more stringent standard for what constitutes a "substantial

burden." In Warner, the Florida Supreme Court assessed three competing

standards adopted at that time by federal courts evaluating the federal Religious

Freedom Restoration Act (RFRA). 887 So.2d at 1033. The Florida Supreme

Court explicitly adopted the narrowest of these standards, holding that "a

substantial burden on the free exercise of religion is one that either compels the

religious adherent to engage in conduct that his religion forbids or forbids him to

engage in conduct that his religion requires." Id.

As this Court has explained, a burden on religious exercise is only

substantial under FRFRA "if a person is prohibited from engaging in protected

religious conduct (or, if the exercise of religion is a refusal to act, the person is

compelled to act)" and that under this standard "[l]aws that merely inconvenience

religion do not create a substantial burden." First Vagabonds Church of God v.

City of Orlando, 610 F.3d 1274, 1290 (11th Cir. 2010), vacated, 616 F.3d 1229

(11th Cir. 2010), reinstated in part, 638 F.3d 756 (11th Cir. 2011) (en banc)

(reinstating the panel opinion as to, inter alia, the FRFRA claim). In First

Vagabonds, the plaintiffs -- a church consisting mostly of homeless congregants

and a nonprofit -- held services and provided food for congregants at a public park

in Orlando. Id. at 1280. After complaints from people living in neighborhoods

64

near the park, the City passed an ordinance that required a permit for any event likely to attract 25 or more people for the delivery or service of food in city parks, and limited the number of permits any person or organization could obtain for a single park to two per year. Id. at 1280–81. We affirmed the district court's dismissal of the plaintiffs' FRFRA claim, accepting that feeding the homeless was a protected religious exercise under FRFRA, but concluding that the ordinance did not "affirmatively forbid the Church from feeding its members as part of its religious services." Id. at 1291 (emphasis added); see also id. at 1290 ("The FRFRA does not provide the Church with a right to conduct its services at any location it desires; it does not guarantee access to the City's most desirable park (or, for that matter, any park at all)."). Indeed, in that case, the district court had dismissed the claim even though it "considered the burden on the Church and its members 'significant,'" because even a "significant" burden does not meet FRFRA's substantial burden prong. Id.

We can find nothing in the complaint, drawing every reasonable inference in favor of Cambridge Christian, that comes close to pleading a substantial burden as defined by Florida's Supreme Court. Because Cambridge Christian did not plead -- nor does it even say in its briefing to this Court -- that the FHSAA forbid it from engaging in conduct that its religion mandated when it was denied access to the

65

loudspeaker, Cambridge Christian has failed to plausibly plead a claim under FRFRA. Accordingly, we affirm the district court's dismissal of that claim.

V.

Counts III and VI of the complaint sought declaratory judgments under the Establishment Clauses of the U.S. and Florida Constitutions. We review the district court's dismissal of these actions only for abuse of discretion. Smith v. Casey, 741 F.3d 1236, 1244 (11th Cir. 2014).

Overturning a district court's denial of declaratory relief, even at the motion to dismiss stage requires a heavy lift. Not only do we review this matter only for abuse of discretion, but the district court's initial decision has an explicitly wide range of discretion. District courts have "broad statutory discretion to decline declaratory relief." Wilton v. Seven Falls Co., 515 U.S. 277, 287 (1995). Reposing broad discretion in the district courts is wholly consonant with the purposes of declaratory relief. The Supreme Court has said that '[b]y the Declaratory Judgment Act, Congress sought to place a remedial arrow in the district court's quiver; it created an opportunity, rather than a duty, to grant a new form of relief to qualifying litigants." Id. at 288. The remedy is "nonobligatory" and "[i]n the declaratory judgement context, the normal principle that federal courts should adjudicate claims within their jurisdiction yields to considerations of practicality and wise judicial administration." Id. "When all is said and done . . .

66

'the propriety of declaratory relief in a particular case will depend upon a circumspect sense of its fitness informed by the teachings and experience concerning the functions and extent of federal judicial power.'" Id. at 287 (quoting Comm'n of Utah v. Wycoff Co., 344 U.S. 237, 243 (1952)).

The district court held that "there [was] no actual controversy as to this claim" and that the allegations made by Cambridge Christian under the Establishment Clause "were more appropriately addressed in the context of its claims under the Free Exercise and Free Speech Clauses." It is unclear from the district court's ruling whether this was intended as a constitutional holding that the Establishment Clause claims failed to state a "case or controversy" under Article III, or simply a holding that the essence of this case was more appropriately framed under other clauses and that the district court was not inclined to spend time and energy addressing a far more speculative claim, even if it was justiciable.

"[T]he Declaratory Judgment Act does not enlarge the jurisdiction of the federal courts," meaning that, at the very least, a controversy under the Act must also be a "case or controversy" under Article III. GTE Directories Pub. Corp. v Trimen Am., Inc., 67 F.3d 1563, 1567 (11th Cir. 1995); see also Gagliardi v. TJCV Land Tr., 889 F.3d 728, 734–35 (11th Cir. 2018) ("[T]here must . . . be a case or controversy that is live, is 'definite and concrete,' and is susceptible to 'specific relief through a decree of a conclusive character, as distinguished from an opinion

67

advising what the law would be upon a hypothetical state of facts.'" (quoting

Aetna Life Ins. Co. v. Haworth, 300 U.S. 227, 240–41 (1937))).

In any event, we need not decide whether the holding was a constitutional

one, since the district court acted well within its discretion and since we agree that

the case is better presented under the Free Exercise and Free Speech Clauses.  In

seeking declaratory relief under the Establishment Clause, Cambridge Christian

asks for a ruling that the FHSAA was not required by the Establishment Clause to

deny its prayer request.  If Cambridge Christian has any legal interest in this sort of

declaratory relief, it must be because it suffered an injury when it was not allowed

to pray over the loudspeaker.  That injury would have to be an injury to Cambridge

Christian's rights under the Free Speech or Free Exercise Clauses; it wouldn't be

an Establishment Clause injury.  That is to say, it is hard to see how Cambridge

Christian could win declaratory relief under the Establishment Clause without first

establishing that it was entitled to injunctive relief under the Free Speech or Free

Exercise Clauses.  If it did win injunctive relief under one of those other clauses,

declaratory relief under the Establishment Clause would be redundant, and without

injunctive relief under one of those other clauses, a declaratory judgment stating

that the FHSAA wasn't required to deny the prayer request would not get the

school any closer to praying over the loudspeaker.

With the real controversy rooted in the Free Speech and Free Exercise Clauses, it's understandable that the district court would view the Establishment Clause declaratory relief as beside the point. It did not abuse its considerable discretion in declining to engage in the circuitous reasoning that would have been required for it to declare that the Establishment Clause would not bar the FHSAA from allowing prayer over the loudspeaker. It was not an abuse of discretion for the district court to view the declaratory judgment action as being largely hypothetical and lacking "sufficient immediacy," especially when it was presented alongside more straightforward claims that could yield the same result. Thus, we affirm the district court's decisions on Claims III and VI.

## VI.

At the end of the day, Cambridge Christian has said enough to plausibly allege violations of the Free Speech and Free Exercise Clauses of the United States and Florida Constitutions. We reverse the district court's decision insofar as it bars the claims brought under these provisions. We affirm the district court's dismissal of the FRFRA claim. We also affirm the decision insofar as it relates to the Establishment Clauses. With the limited exception of its decision not to entertain declaratory judgments under those claims and to dismiss the FRFRA claim, we think the district court was not appropriately generous in its reading of Cambridge Christian's pleading. We do not know whether the course of litigation will

69

establish violations of the First Amendment, but Cambridge Christian has plausibly pled enough in its complaint to get into the courthouse and be heard. Accordingly, we remand these claims to the district court for further proceedings consistent with this opinion.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**