[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 21-11298

_____

REGINALD L. GUNDY,

Plaintiff-Appellant,

*versus*

CITY OF JACKSONVILLE FLORIDA,
a Municipality of the State of Florida,
AARON L. BOWMAN,
individually,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Middle District of Florida

D.C. Docket No. 3:19-cv-00795-BJD-MCR

—————————————

Before LAGOA, BRASHER, and TJOFLAT, Circuit Judges.

Lagoa, Circuit Judge:

This appeal arises from a legislative invocation given by an invited, guest speaker before the opening of a Jacksonville City Council meeting.[1] It centers on the unique role of legislative invocations in our country's history and tradition, the First Amendment, and the distinction between government speech and private speech. As a matter of first impression for our Circuit, we hold that the legislative invocation at issue constitutes government speech. For this reason, after careful review and with the benefit of oral argument, we hold that the district court erred in its motion to dismiss and summary judgment orders by classifying the legislative invocation as private speech in a nonpublic forum. That said, we nonetheless affirm the district court's ultimate disposition of the case because we hold that Reginald L. Gundy's invocation constitutes government speech, not subject to attack on free speech or free exercise grounds. A discussion of the four-minute sequence of events and relevant procedural background that led to this appeal now follows.

---

[1] This opinion refers to the City of Jacksonville, Florida, as the "City" and to the Jacksonville City Council as the "City Council."

## I.    FACTUAL AND PROCEDURAL BACKGROUND

### A.  The Invocation and Initiation of Legal Proceedings

According to a 2010 City Council memorandum (the "Webb Policy"), the City Council "has long maintained a tradition of solemnizing its proceedings by allowing for an opening invocation before each meeting, for the benefit and blessing of the Council." Under this policy, "legislative invocations are not a forum for the free exercise of personal religious beliefs, but rather a vehicle through which the Council itself, through selected speakers, seeks blessings and guidance in accomplishing its governmental work." The Webb Policy also states that "legislative invocations must not be exploited to proselytize or advance any one faith or belief, or to disparage any other faith or belief, and must not create the impression that the legislative body is affiliated, or intends to affiliate, with any particular faith or belief." Additionally, "[i]ndividuals remain free to pray on their own behalf, as their conscience requires."

As part of this history and tradition, City Council Rule 1.106 calls for the appointment of a council member as "Chaplain of the Council" to help facilitate "a prayer/invocation" before each meeting; in accordance with Rule 1.106, "[e]ach council member" is given an opportunity to invite a speaker from "religious congregations with an established presence in Jacksonville" to give an invocation. And in line with this directive, Anna Brosche, a City Council member and a then-mayoral candidate, invited Reginald L. Gundy to give the invocation at the March 12, 2019, City Council

meeting.  The City Council meeting preceded election day for the municipal elections by about a week.

Mr. Gundy, a senior pastor at the Mount Sinai Missionary Baptist Church in Jacksonville, accepted Ms. Brosche's offer.  At the time, Mr. Gundy was a supporter of Ms. Brosche's mayoral campaign, having donated to the campaign and having hosted a campaign meeting at his church.  After accepting Ms. Brosche's offer, Mr. Gundy typed out a two-page prayer before the City Council meeting.  Then, on March 12, Mr. Gundy arrived at the City Council meeting.  Without being given a time limit for his invocation or advised as to topics deemed appropriate for invocations, Mr. Gundy stepped up to the microphone at the lectern and began his invocation.

Mr. Gundy started with a direct appeal to a higher power. When Mr. Gundy transitioned to levying criticisms against the City's executive and legislative branches, Aaron Bowman, president of the City Council at the time, interrupted Mr. Gundy, stating: "Mr. Gundy, I'm going to ask you . . . [to] make it a spiritual prayer.  Thank you."  Mr. Gundy continued with the invocation, and, when Mr. Bowman felt that Mr. Gundy did not change the tenor of the invocation, Mr. Bowman cut off the feed to Mr. Gundy's microphone.  Mr. Gundy then finished the invocation without the benefit of the microphone.  With neither incident nor confrontation, Mr. Gundy left the lectern after the City Council recited the Pledge of Allegiance.

A day after the invocation, Mr. Bowman, who supported Ms. Brosche's opponent in the mayoral race, Lenny Curry, took to Twitter and made a thinly veiled reference to Ms. Brosche, stating:

> I never envisioned a [council member] stooping so low to find a pastor that would agree to such a sacrilegious attack politicizing something as sacred as our invocation.  It obviously was a last ditch effort to try and revive a failed term and campaign.  Fortunately I control the microphone.

Per his deposition testimony about his decision to cut off the microphone, Mr. Bowman believed that Mr. Gundy's invocation "was not a blessing of the [C]ouncil" and that "it crossed the political lines" by "attacking the administration, knowing that [Mr. Gundy] had sponsored [Ms. Brosche] at his church for an event." Mr. Bowman said that he "felt [Mr. Gundy] was attacking us as a legislative body. . . .   And then it became clear that, yes, [Mr. Gundy] was attacking the current mayor. . . .  [Mr. Gundy] called out the executive branch." To Mr. Bowman, "it was very clear that [Mr. Gundy] was acting on [Ms. Brosche's] behalf to try to discredit the current-sitting mayor and her opponent."  Mr. Bowman also stated that the invocation was "not appreciated by many of the council members and they wanted [him] to take action."

Mr. Bowman noted that determining when someone crosses the line in an invocation is like "artwork" in that Mr. Bowman does not "know it until [he] see[s] it" but, once known, he can act to prevent an invocation from straying from its purpose as a

blessing and proceeding into a political discussion. This is because Mr. Bowman, as the president of the City Council, has general authority under City Council Rule 1.202 to "control . . . the Council chamber and committee room and . . . the offices and other rooms assigned to the use of the Council whether in City Hall or elsewhere," as well as general authority to maintain decorum and discipline when serving as the presiding officer of meetings under City Council Rules 4.202(f) and 4.505. Mr. Bowman stated that a political attack against "anybody," including a hypothetical attack against Ms. Brosche, would be "out of line" and that "[a]ny discussion of politics" in the City Council chamber would require Mr. Bowman to take action.

On July 2, 2019, Mr. Gundy brought suit against both the City and Mr. Bowman in his personal capacity. Mr. Gundy then filed an amended complaint on September 30, 2019, marking the operative complaint of the lawsuit. In his amended complaint, Mr. Gundy alleged four counts against the City and Mr. Bowman. The counts stemmed from Mr. Bowman's decision to cut the feed to Mr. Gundy's microphone and Mr. Bowman's subsequent actions, including issuing the Twitter statement and a May 1, 2019, memorandum that outlined new procedures for prayer invocations (the "Bowman Memorandum").

In his first two counts, actionable under 42 U.S.C. § 1983, Mr. Gundy alleged that both the City and Mr. Bowman violated his First Amendment rights under the Free Exercise Clause (Count I) and the Free Speech Clause (Count II) of the United States

Constitution.  Under both counts, Mr. Gundy alleged that Mr. Bowman's actions violated his "clearly established" constitutional rights and were retaliatory, though he did not bring a discrete count for First Amendment retaliation.  For the same reasons, Mr. Gundy brought another two counts against the City, alleging violations of the free exercise and the free speech clauses of the Florida Constitution (respectively, Counts III and IV).

Per his deposition testimony, Mr. Gundy said that he was "offended by [Mr. Bowman's tweet]" calling his "prayer . . . sacrilegious" and that he felt like his "constitutional rights ha[d] been violated."  In his amended complaint, Mr. Gundy also noted that Mr. Bowman did not interrupt a 2018 invocation in which "the presenter extensively discussed violence in the City of Jacksonville."  For these reasons, Mr. Gundy alleged that Mr. Bowman's actions "were taken for retaliatory, political and other impermissible reasons" and that the City Council, through the City Council Rules, policy, and the Bowman Memorandum, maintained a "policy, custom, and practice" of limiting the free exercise of religion and speech.

## B.  Motion to Dismiss and Subsequent District Court Order

On October 14, 2019, the City and Mr. Bowman (collectively, "Defendants") moved to dismiss Mr. Gundy's amended complaint with prejudice.  The Defendants later amended their motion to dismiss on April 17, 2020.  As relevant to this appeal, the Defendants argued that Mr. Gundy's rights had not been violated because the "limited and focused purpose" of Mr. Gundy's "invited

speech was to offer up a religious benediction to the nineteen-member City Council." For this reason, the Defendants argued that Mr. Gundy's invocation constituted government speech subject to the confines of the Establishment Clause—not the confines of the Free Speech Clause or the Free Exercise Clause. And, while Mr. Gundy did not plead a discrete Establishment Clause count, the Defendants argued that Mr. Gundy's amended complaint failed to "plausibly allege that the limits Defendants placed on his" invocation "violated the Establishment Clause, much less the Free Exercise and Free Speech Clauses of the First Amendment." This is because they argued that limiting invocations to "religious prayer"—versus political speech or secular prayer—is a valid restraint under the Establishment Clause.

Seemingly in the alternative and advancing a private speech theory, the Defendants also argued that the "Council Chambers, and in particular the invocation itself prior to a public meeting, is a limited public forum," in which Mr. Gundy "did not have a First Amendment right to engage in any and all speech." In such a setting, the Defendants argued that a restriction on speech is "permitted as long as it is reasonable given the forum's purpose and not based on any one viewpoint and alternative opportunities," such as the public comments portions of City Council meetings, "are provided to communicate one's speech." The Defendants argued that Mr. Bowman's "restriction was reasonable given the purpose of invocations" and that the restriction "was a proper time, place and manner restriction in a limited forum meant only for prayer for the

Council's benefit at the start of each meeting, in order to control and keep the meeting orderly."

In concluding their motion to dismiss, the Defendants argued that Mr. Bowman was entitled to qualified immunity, given his role as City Council president. The Defendants also argued that the City was entitled to sovereign immunity as to the state law claims. Finally, they argued that Mr. Gundy could not seek money damages under the Florida Constitution.

On November 4, 2020, the district court granted the Defendants' motion to dismiss in part and denied it in part. The district court dismissed all of Mr. Gundy's claims against Mr. Bowman (i.e., Counts I and II), as well as the free exercise of religion claims against the City (i.e., Counts I and III) with prejudice. The district court also limited Mr. Gundy's request for money damages to his remaining free speech claim against the City under the United States Constitution (i.e., Count II) and disallowed money damages for his remaining free speech claim against the City under the Florida Constitution (i.e., Count IV).

As to the claims against Mr. Bowman, the district court found Mr. Bowman entitled to qualified immunity. In conducting its qualified immunity analysis, the district court found that "Mr. Bowman was undoubtedly acting in his official capacity when the alleged conduct took place." Thus, the district court turned to whether Mr. Gundy had met his burden of identifying a "clearly established" statutory or constitutional right in which a reasonable person, in Mr. Bowman's position, would have been aware of

before silencing the microphone.  The district court held that Mr. Gundy failed to meet such a burden because Mr. Gundy's citations to caselaw and City Council policies pertained to the Establishment Clause and the legality of legislative prayer, in general—not whether the City Council and Mr. Bowman had the ability to impede Mr. Gundy's invocation.

As to the free exercise claims against the City (i.e., Counts I and III), the district court examined both the Bowman Memorandum, as referenced by Mr. Gundy's complaint, along with the City Council Rules, because of Mr. Gundy's "repeated references to Mr. Bowman requesting [Mr. Gundy] cease his invocation" in the amended complaint.  The district court found that the "plain language" of the Bowman Memorandum "expressly refute[d]" Mr. Gundy's allegation that it precluded him from praying as his conscience required.  The district court also noted that the Bowman Memorandum was issued *after* Mr. Gundy's invocation, so it was not germane to his claims.  Finally, the district court noted that the "general procedural rules giving the Council President the ultimate authority to conduct and manage Council meetings" are rules "of general application," which "do not expressly prohibit any individual from holding or acting in accordance with a sincerely held belief."  Since the district court held that "[l]aws of general application," including those with incidental burdens on religious practice, do not require justification via a compelling interest, the district court also held that the City Council's "interest in maintaining order during its meetings," coupled with the fact that Mr. Gundy was

allowed to complete his prayer, indicated that Mr. Gundy's right to free exercise under both the United States Constitution and the Florida Constitution was not violated.

As to the remaining free speech claims against the City, the district court held that it could not "conclude that [Mr. Gundy's] invocation was unquestionably government speech as a matter of law, as Defendants" argued.  The district court noted that if it deemed Mr. Gundy's invocation government speech, then Mr. Gundy's claims would fail because the Free Speech Clause does not regulate government speech.  Citing *Mech v. School Board of Palm Beach County*, 806 F.3d 1070 (11th Cir. 2015), and "[b]eing conscientious of" this Court's "warning to tread lightly when judicially declaring speech to be the government's own," the district court found that Mr. Gundy "sufficiently alleged that at least some of his speech could be categorized as private speech subject to First Amendment protection."

Since the district court found that the invocation "arguably involve[d] private speech," the district court then went into a discussion about the nature of the speaking forum.  Relying on *Cambridge Christian School, Inc. v. Florida High School Athletic Ass'n, Inc.*, 942 F.3d 1215 (11th Cir. 2019), the district court found the invocation setting to be a nonpublic forum.  The district court then noted that "further development of the record" would be needed to determine whether Mr. Bowman's decision to cut off the microphone was viewpoint neutral and nondiscriminatory.  Thus, the district court denied the Defendants' motion to dismiss as to the

free speech claims against the City and allowed the case to proceed with discovery.

### C. Motion for Summary Judgment and Subsequent District Court Order

On November 30, 2020, the City moved for summary judgment on the remaining free speech claims (i.e., Counts II and IV) under the United States Constitution and the Florida Constitution. On March 22, 2021, the district court granted the City's motion for summary judgment. The district court held that the City was not liable under § 1983 because "the record d[id] not reflect [that] the City had a history of arbitrary enforcement" of the City Council Rules when it came to restricting speech.

In reaching its ultimate holding and relying on its previous motion to dismiss order, the district court first found that, under *Cambridge Christian*, Mr. Gundy's speech constituted private speech. Next, because of the closed nature of the invocation as compared to the open, public comments portions of City Council meetings, the district court again found that the invocation setting constituted a nonpublic forum. Then, the district court turned to the question of § 1983 and the scope of municipal liability.

Citing the *Monell* doctrine,[2] the district court noted that Council Rule 1.202, which grants general authority to the City Council president to exercise control over City Council meetings,

---

[2] *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978).

21-11298                Opinion of the Court                13

was "undoubtedly a 'policy' for purposes of . . . *Monell* analysis."[3] For this reason, the district court examined whether the "City's restriction of [Mr. Gundy's] speech was reasonable—i.e., whether [Mr. Gundy's] First Amendment rights were violated." Since the government's ability to "limit[] speech is . . . at its highest" in a non-public forum, the district court found Council Rule 1.202 as "facially reasonable" when used to enforce "content-based restrictions on speech to ensure an invocation is preserved for its intended purposes." The district court then held that Mr. Gundy failed to show that the policy was "used in a way that discriminated based on a speaker's viewpoint" or that the policy was "enforced arbitrarily."

The district court held that cutting the feed to Mr. Gundy's microphone did not constitute viewpoint discrimination. The district court found that "Mr. Bowman's comment when interrupting [Mr. Gundy] and the subsequent removal of [Mr. Gundy's] amplification were for the stated purposed of preserving the invocation for" the solemnization of City Council meetings and the blessing of City Council members. While the district court held that Mr. Gundy's remarks "might have been entirely appropriate if delivered in a more public forum" or at Mr. Gundy's "pulpit," they were subject to "reasonable and viewpoint-neutral limitations" once Mr. Gundy's invocation "became contentious and divisive." The district court also credited Mr. Bowman's testimony about his

---

[3] The district court found that the Bowman Memorandum could not be seen as a municipal policy under the *Monell* doctrine because the Bowman Memorandum "was not in effect when [Mr. Gundy] gave his invocation."

apolitical intentions when impeding Mr. Gundy as part of "undisputed" facts indicating the viewpoint-neutral nature of Mr. Bowman's actions.

As to whether the City, via Mr. Bowman, enforced Council Rule 1.202 arbitrarily, the district court held that the City did not. The district court noted that Mr. Gundy failed to present "any evidence" to support such a claim. The district court found Mr. Gundy's "sole example" of the City Council allowing an invocation to continue with allegedly "disparaging or divisive remarks" as "hardly comparable" to Mr. Gundy's remarks. The district court noted that the context of Dr. Nicholas Louh's August 2018 invocation, which had been identified as the invocation Mr. Gundy referenced in his amended complaint, came "three days following the fatal mass shooting at the Jacksonville Landing." Moreover, and "more saliently," the district court noted that Dr. Louh's invocation, while "somber and reflective in reference to violence in the City of Jacksonville," refrained from "placing blame on the legislature or executive branch" and lacked "divisive or accusatory" language. For these reasons, the district court found Dr. Louh's invocation as substantially dissimilar to Mr. Gundy's invocation and held that Mr. Bowman did not enforce the City Council Rules in an arbitrary or haphazard manner.

Ultimately, in granting summary judgment for the City, the district court noted two caveats. First, the district court stated that "the City prevailed in this action because the record d[id] not reflect [that] the City had a history of arbitrary enforcement of Council

Rule 1.202." Thus, the district court explained that, on "a different record," a "different outcome could result" from the actions of a City Council president. Second, the district court stated that it was "not meant to be the arbiter of what" constitutes "allowable 'prayer,'" implying that it had done no such thing in coming to its disposition of the case. Finally, the district court concluded by noting the dangers that can occur if courts become overly involved in censoring religious speech.

Mr. Gundy timely appealed the district court's orders granting the motion to dismiss, in part, and granting summary judgment.

## II.    STANDARD OF REVIEW

"We review *de novo* a district court's grant of a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim, accepting the complaint's factual allegations as true and construing them in the light most favorable to the plaintiff." *United States v. Henco Holding Corp.*, 985 F.3d 1290, 1296 (11th Cir. 2021). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

Likewise, we review de novo a district court's order granting summary judgment. *Mech*, 806 F.3d at 1074. "Summary judgment is appropriate if 'the evidence before the court shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *McCullough v. Antolini*, 559 F.3d 1201, 1204 (11th Cir. 2009) (quoting *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995)). "When considering a motion for summary judgment, . . . 'courts must construe the facts and draw all inferences in the light most favorable to the non-moving party and when conflicts arise between the facts evidenced by the parties, [they must] credit the nonmoving party's version.'" *Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1252 (11th Cir. 2013) (alteration in original) (quoting *Davis v. Williams*, 451 F.3d 759, 763 (11th Cir. 2006)). Finally, we "may affirm the judgment of the district court on any ground supported by the record, regardless of whether that ground was relied upon or even considered by the district court." *Kernel Recs. Oy v. Mosley*, 694 F.3d 1294, 1309 (11th Cir. 2012).

## III.    ANALYSIS

On appeal, Mr. Gundy raises three primary arguments. First, Mr. Gundy argues that the district court erred in finding Mr. Bowman entitled to qualified immunity and dismissing the federal claims against Mr. Bowman. Second, Mr. Gundy argues that the district court erred by dismissing the claims against the City under the *Monell* doctrine because Mr. Bowman acted in an arbitrary, haphazard, or discriminatory manner when he cut Mr. Gundy's

21-11298                Opinion of the Court                17

microphone feed.  Finally, Mr. Gundy argues that the district court erred by failing to address his First Amendment retaliation claims. As made clear by these arguments, Mr. Gundy's appeal centers on the fact that he brought counts against Mr. Bowman and the City based on alleged violations of his free speech and free exercise rights under the United States Constitution and the Florida Constitution.[4]

        As a threshold and dispositive matter, and for the reasons discussed below, we hold that the district court erred in deeming the invocation private speech in a nonpublic forum instead of government speech.  And since Mr. Gundy did not allege a violation of his rights under the Establishment Clause, which is the proper

---

[4] "Florida's courts have treated the Free Speech and Free Exercise Clauses of the Florida Constitution as being coextensive with those embodied in the United States Constitution, and have adopted the same principles and methods of analysis." *Cambridge Christian*, 942 F.3d at 1228 n.2; *see also Cafe Erotica v. Fla. Dep't of Transp.*, 830 So. 2d 181, 183 (Fla. Dist. Ct. App. 2002) ("The scope of the Florida Constitution's protection of freedom of speech is the same as required under the First Amendment. . . . Thus, this [c]ourt applies the principles of freedom of speech as announced in the decisions of the Supreme Court of the United States."); *Toca v. State*, 834 So. 2d 204, 208 (Fla. Dist. Ct. App. 2002) (applying the same analysis when reviewing claims under the Free Exercise Clause of the United States Constitution and the Florida Constitution).  For this reason, we proceed by addressing Mr. Gundy's claims under the United States Constitution, and our analysis applies in full to Mr. Gundy's claims under the Florida Constitution.

constitutional vehicle to attack the government speech at issue here, his appeal must fail.[5]

### A. Mr. Gundy's Invocation Constitutes Government Speech

"The First Amendment works as a shield to protect *private* persons from 'encroachment[s] by the government' on their right to speak freely, not as a sword to compel the government to speak for them." *Leake v. Drinkard*, 14 F.4th 1242, 1247 (11th Cir. 2021) (alteration and emphasis in original) (citation omitted) (quoting *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos., Inc.*, 515 U.S. 557, 566 (1995)). Thus, "[w]hen government speaks, it is not barred by the Free Speech Clause from determining the content of what it says." *Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 207 (2015); *see also Mech*, 806 F.3d at 1074 ("The Free Speech Clause of the First Amendment 'restricts government regulation of private speech; it does not regulate government speech.'" (quoting *Pleasant Grove City v. Summum*, 555 U.S. 460, 467 (2009))). In this regard, "government statements (and government actions and programs that take the form of speech) do not normally trigger the First Amendment rules designed to protect the marketplace of ideas." *Walker*, 576 U.S. at 207. Indeed, "[w]hen the government exercises 'the right to "speak for itself,"'"

---

[5] The Free Speech, Free Exercise, and Establishment Clauses of the First Amendment have been incorporated, via the Fourteenth Amendment, to apply to the States and their subdivisions. *See, e.g.*, *Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940); *Schneider v. Town of Irvington*, 308 U.S. 147, 160 (1939).

it can freely 'select the views that it wants to express,'" including "'choosing not to speak' and 'speaking through the . . . removal' of speech that the government disapproves." *Mech*, 806 F.3d at 1074 (first quoting *Summum*, 555 U.S. at 467–68; then quoting *Downs v. L.A. Unified Sch. Dist.*, 228 F.3d 1003, 1012 (9th Cir. 2000)).

To be sure, "[t]his does not mean that there are no restraints on government speech." *Summum*, 555 U.S. at 468. "[G]overnment speech must comport with the Establishment Clause," for one. *Id.* And "a government entity is ultimately 'accountable to the electorate and the political process for its advocacy.'" *Id.* (quoting *Bd. of Regents of Univ. of Wis Sys. v. Southworth*, 529 U.S. 217, 235 (2000)). "If the citizenry objects, newly elected officials later could espouse some different or contrary position." *Southworth*, 529 U.S. at 235.

Thus, the distinction between government speech and private speech plays the pivotal role in this appeal. If Mr. Gundy's invocation is considered government speech, his free speech claims must fail because government speech does not enjoy protection under the Free Speech Clause. *Mech*, 806 F.3d at 1072. And in that circumstance, Mr. Gundy's free exercise claims also must fail because, "when members of a governmental body participate in a prayer for themselves and do not impose it on or prescribe it for *the people,* the religious liberties secured *to the people* by the First Amendment are not *directly* implicated." *Simpson v. Chesterfield Cnty. Bd. of Supervisors*, 404 F.3d 276, 289 (4th Cir. 2005) (Niemeyer, J., concurring) (emphasis in original); *accord Fields v.*

*Speaker of Pa. House of Representatives*, 936 F.3d 142, 160 (3d Cir. 2019) ("Because legislative prayer is government speech, the Free Exercise Clause does not apply, and the [plaintiffs'] free-exercise claim fails.").

As discussed above, the district court opined on the issue of whether Mr. Gundy's invocation constituted government speech or private speech without reaching a definitive conclusion when granting, in part, the Defendants' motion to dismiss. The district court discussed the three *Cambridge Christian* factors that this Court relies on to determine whether speech constitutes government speech—namely, (1) history; (2) endorsement; and (3) control, *see* 942 F.3d at 1230–36—and stated that, at the "early stage" of the litigation, the district court could not conclude that the "invocation was unquestionably government speech." Then, in its order granting summary judgment, the district court explained that the City provided the Webb Policy as the "only additional fact . . . in support of the City's position" that the invocation constituted government speech. While the district court noted that certain elements of the Webb Policy "may tilt" the control factor in favor of a government speech determination, the district court stated that the *Cambridge Christian* factors "continue[d] to support a finding that the contents of" Mr. Gundy's "prayer was his own private speech."

On appeal, the Defendants "contend that the invocation" constitutes "government speech." By contrast, Mr. Gundy "agrees" with the district court "that the speech at issue is private"

but claims that "the material facts in dispute provide that the forum at the invocation could be considered a limited public forum where government reserves a forum for certain groups or for the discussion of certain topics." For these reasons, we must address the threshold issue of whether Mr. Gundy's invocation constitutes government speech or private speech in some type of forum. In addressing this issue, we first note the unique and well-established role of legislative prayer in this country's history and tradition. We then apply this Circuit's government speech precedent to conclude that Mr. Gundy's invocation constitutes government speech, thereby agreeing with several sister circuits that have determined that legislative prayer constitutes government speech.

1.  *Legislative Prayer Occupies a Unique Place in Our History and Tradition under the Establishment Clause*

In *Marsh v. Chambers*, 463 U.S. 783 (1983), the Supreme Court directly addressed the constitutionality of legislative prayer in considering "whether the Nebraska Legislature's practice of opening each legislative day with a prayer by a chaplain paid by the State violate[d] the Establishment Clause of the First Amendment." 463 U.S. at 784. Reversing the Eighth Circuit, the Supreme Court held that it did not. *Id.* at 795.

The Supreme Court reasoned that the "opening of sessions of legislative and other deliberative public bodies with prayer is deeply embedded in the history and tradition of this country," flowing from "colonial times through the founding of the Republic and ever since." *Id.* at 786. And the Supreme Court noted that

"three days after Congress authorized the appointment of paid chaplains" in 1789, "final agreement was reached on the language of the Bill of Rights," showing that "[c]learly the men who wrote the First Amendment Religion Clause did not view paid legislative chaplains and opening prayers as a violation of that Amendment, for the practice of opening sessions with prayer has continued without interruption ever since that early session of Congress." *Id.* at 788. For these reasons, the Supreme Court concluded:

> In light of the unambiguous and unbroken history of more than 200 years, there can be no doubt that the practice of opening legislative sessions with prayer has become part of the fabric of our society. To invoke Divine guidance on a public body entrusted with making the laws is not, in these circumstances, an "establishment" of religion or a step toward establishment; it is simply a tolerable acknowledgment of beliefs widely held among the people of this country.

*Id.* at 792.

The Supreme Court also looked at three specific aspects of the Nebraska policy—namely, the chaplain's long tenure and Presbyterian denomination, the state-funded nature of the chaplain's salary, and the "Judeo-Christian tradition" of the chaplain's prayers—to determine whether the policy violated the Establishment Clause. *Id.* at 792–93. Most importantly for this appeal, the Supreme Court determined that the "content of the prayer is not of concern to judges where . . . there is no indication that the prayer

opportunity has been exploited to proselytize or advance any one, or to disparage any other, faith or belief." *Id.* at 794–95.

Several years after *Marsh*, the Supreme Court decided *County of Allegheny v. American Civil Liberties Union*, 492 U.S. 573 (1989), *abrogated by Town of Greece v. Galloway*, 572 U.S. 565 (2014). It is notable for its commentary, in dictum, about *Marsh*. Specifically, *County of Allegheny* dealt with whether the display of a crèche and a menorah on municipal property violated the Establishment Clause. 492 U.S. at 578–79. For purposes of this appeal, in dictum, the majority attributed the holding that the legislative prayer in *Marsh* did not violate the Establishment Clause due to the fact that the "chaplain had 'removed all references to Christ.'" *Id.* at 603 (quoting *Marsh*, 463 U.S. at 793 n.14). Thus, the opinion set forth the implication that the holding in *Marsh* only applied to nonsectarian forms of prayer.

Twenty-five years after *County of Allegheny*, the Supreme Court returned to the topic of legislative prayer in *Town of Greece v. Galloway*. In that case, the Supreme Court needed to "decide whether the town of Greece, New York, impose[d] an impermissible establishment of religion by opening its monthly board meetings with a prayer," given by solely Christian ministers "from 1999 to 2007." 572 U.S. at 569–71. After reviewing the town's legislative prayer policies, the Supreme Court held that the town did not violate the Establishment Clause. *Id.* at 570, 575.

In so doing, the Supreme Court clarified that the "inquiry" into whether legislative prayer violates the Establishment Clause

depends on whether the legislative prayer at issue "fits within the tradition long followed in Congress and the state legislatures." *Id.* at 577. Dispelling the interpretation of the dictum in *County of Allegheny*, the Supreme Court stated that an "insistence on non-sectarian or ecumenical prayer as a single, fixed standard is not consistent with the tradition of legislative prayer outlined in the Court's cases," most notably *Marsh*'s harkening back to the "decidedly Christian nature" of the first prayers given before Congress. *Id.* at 578–81. The Supreme Court reiterated that "the 'content of the prayer is not of concern to judges,' provided 'there is no indication that the prayer opportunity has been exploited to proselytize or advance any one, or to disparage any other, faith or belief.'" *Id.* at 581 (quoting *Marsh*, 463 U.S. at 794–95). Thus, the Supreme Court "reject[ed] the suggestion that legislative prayer must be nonsectarian." *Id.* at 582.

In reaching this holding, the Supreme Court reasoned that a contrary holding "would force the legislatures that sponsor prayers and the courts that are asked to decide these cases to act as supervisors and censors of religious speech," which "would involve government in religious matters to a far greater degree than is the case under the town's current practice of neither editing or approving prayers in advance nor criticizing their content after the fact." *Id.* at 581. And the Supreme Court noted that the "First Amendment is not a majority rule, and government may not seek to define permissible categories of religious speech." *Id.* at 582. For this reason, once government "invites prayer into the public sphere,

government must permit a prayer giver to address his or her own God or gods as conscience dictates, unfettered by what an administrator or judge considers to be nonsectarian." *Id.*

The Supreme Court clarified that the holding did "not imply that no constraints remain on [legislative prayer's] content," but rather the "relevant constraint derives from [the] place" of legislative prayer "at the opening of legislative sessions, where it is meant to lend gravity to the occasion and reflect values long part of the Nation's heritage." *Id.* at 582–83. According to the Supreme Court, "[p]rayer that is solemn and respectful in tone, that invites lawmakers to reflect upon shared ideals and common ends before they embark on the fractious business of governing, serves that legitimate function." *Id.* at 583. The Supreme Court found support for this proposition in examining "the prayers offered to Congress," which "often seek peace for the Nation, wisdom for its lawmakers, and justice for its people, values that count as universal and that are embodied not only in religious traditions, but in our founding documents and laws." *Id.* As to overtly sectarian language, "[i]f the course and practice over time shows that the invocations denigrate nonbelievers or religious minorities, threaten damnation, or preach conversion, many present may consider the prayer to fall short of the desire to elevate the purpose of the occasion and to unite lawmakers in their common effort." *Id.*

Finally, in Part II-B of the opinion, which only Justices Roberts and Alito joined, Justice Kennedy described the format and intended audience for legislative prayer. *Id.* at 586–88. Justice

Kennedy noted that the "principal audience for these invocations is not, indeed, the public but lawmakers themselves, who may find that a moment of prayer or quiet reflection sets the mind to a higher purpose and thereby eases the task of governing." *Id.* at 587. Moreover, while "many members of the public find these prayers meaningful and wish to join them[,] . . . their purpose is largely to accommodate the spiritual needs of lawmakers and connect them to a tradition dating to the time of the Framers." *Id.* at 588. This is because, for "members of town boards and commissions, who often serve part-time and as volunteers, ceremonial prayer may also reflect the values they hold as private citizens." *Id.* And the legislative "prayer is an opportunity for them to show who and what they are without denying the right to dissent by those who disagree." *Id.*

This Court has adopted the tenets expressed in the aforementioned line of Supreme Court jurisprudence and has developed a three-factor analytical framework to determine whether legislative invocations and prayers violate the Establishment Clause. *See generally Pelphrey v. Cobb County*, 547 F.3d 1263 (11th Cir. 2008). This Court considers: (1) the identity of the invocation speaker; (2) the process by which the invocation speaker is selected by a governmental entity; and (3) the nature of the prayer delivered by the invocation speaker to determine whether the prayer "had been exploited to affiliate the [government entity] with a particular faith." *Id.* at 1277–78; *accord Williamson v. Brevard County*, 928 F.3d

1296, 1310–16 (11th Cir. 2019); *Atheists of Fla., Inc. v. City of Lakeland*, 713 F.3d 577, 590–96 (11th Cir. 2013).

This Court has repeatedly cautioned against the need to reach the third factor set forth in the framework, explaining that this Court "read[s] *Marsh . . .* to forbid judicial scrutiny of the content of prayers absent evidence that the legislative prayers have been exploited to advance or disparage a religion." *Pelphrey*, 547 F.3d at 1274. This is because the "federal judiciary has no business in 'compos[ing] official prayers for any group of the American people to recite as a part of a religious program carried on by government.'" *Id.* at 1278 (alteration in original) (quoting *Lee v. Weisman,* 505 U.S. 577, 588 (1992)); *see also Williamson*, 928 F.3d at 1310 ("[J]ust like in *Pelphrey* and *Atheists of Florida*, we have no occasion to engage the third factor of the test—the content of the prayers.").

Keeping in mind the background that legislative invocations and prayers are well-established in this country's history and tradition and the mandate to exercise caution when considering whether to review the content of prayers, we turn to our government speech precedent regarding the direct issue pertinent to this appeal—whether Mr. Gundy's invocation constitutes government speech or private speech.

2. *Under Our Precedent, Mr. Gundy's Invocation Constitutes Government Speech*

Having established the treatment of legislative prayer in the context of the Establishment Clause, we now turn to consideration of legislative prayer and the category of speech that such prayer falls under for purposes of the First Amendment.[6] This Court's 2019 decision in *Cambridge Christian* articulates the standard in which this Court determines whether speech constitutes government speech or private speech. *See* 942 F.3d 1215; *see also Leake*, 14 F.4th 1242.

---

[6] We note decisions from other circuits concluding that legislative prayer constitutes government speech, not private speech, for purposes of the First Amendment. *Simpson*, 404 F.3d at 288 (concluding that invocation before county board of supervisors constituted government speech subject only to the confines of the Establishment Clause under the First Amendment); *id.* at 289 (Niemeyer, J., concurring in judgment) ("[W]hen members of a governmental body participate in a prayer for themselves and do not impose it on or prescribe it for *the people,* the religious liberties secured *to the people* by the First Amendment are not *directly* implicated, and the distinct, more tolerant analysis articulated in *Marsh* governs." (emphasis in original)); *Turner v. City Council of City of Fredericksburg*, 534 F.3d 352 (4th Cir. 2008) (O'Connor, J., retired and sitting by designation) (explaining that, because legislative prayer opening each city council session constituted government speech, free speech and free exercise rights of council member, who had challenged the policy requiring the opening prayer to be nondenominational, were not violated); *Fields*, 936 F.3d at 147 (stating that, for claims arising under "Free Exercise, Free Speech, and Equal Protection Clauses," "legislative prayer is government speech not open to attack via those channels"); *see also Ctr. for Inquiry, Inc. v. Marion Cir. Ct. Clerk*, 758 F.3d 869, 874 (7th Cir. 2014) (noting that *Marsh* and *Town of Greece* concern "what a chosen agent of the government says as part of the government's own operations," but "do *not* concern how a state regulates private conduct" (emphasis in original)).

In *Cambridge Christian*, this Court examined whether the decision to prohibit two Christian schools from using the loudspeaker to broadcast a prayer before the kickoff in a state football playoff game by the Florida High School Athletic Association ("FHSAA"), a "state actor," violated the Free Speech, Free Exercise, and Establishment Clauses of the United States Constitution, as well as those parallel clauses under the Florida Constitution. 942 F.3d at 1222, 1228. The district court had dismissed the entirety of Cambridge Christian School's claims against the FHSAA for failure to state a claim. *Id.* at 1222. As to the free speech claims, the district court concluded that speaking over the loudspeaker was either government speech or, in the alternative, that the loudspeaker "was a nonpublic forum" in which Cambridge Christian School was reasonably restricted from voicing its private speech. *Id.* at 1222–23. As to the free exercise claims, the district court found that the FHSAA did not deny the schools' abilities to pray because the schools were "still allowed to pray together at the center of the football field, albeit without the aid of a loudspeaker system." *Id.* at 1223. Finally, the district court "denied declaratory relief under the Establishment Clauses" of the United States Constitution and the Florida Constitution "on the ground that the controversy was more properly framed under the" respective free speech and free exercise clauses. *Id.*

Ultimately, this Court concluded that "the district court was too quick to dismiss all of Cambridge Christian School's claims out of hand" at the motion to dismiss stage of the litigation because of

the "fact-intensive" nature of the government speech inquiry and the limited record. *Id.* This is because this Court "simply d[id] not have enough information to say with any confidence that, if everything in the complaint [was] true, speech disseminated over the public-address system was and would have been government speech as a matter of law." *Id.* at 1236. And since this Court could not conclude that the speech was government speech as a matter of law on the limited record, "necessarily . . . at least some of [the speech] was private speech," if it was not government speech. *Id.* at 1236. This Court then turned to the district court's alternative finding and concluded that Cambridge Christian School "plausibly alleged only a nonpublic forum and no more," given the restricted nature of the loudspeaker. *Id.* at 1240. This Court also concluded that Cambridge Christian School "plausibly alleged that it was arbitrarily and haphazardly denied access to the forum in violation of the First Amendment." *Id.* at 1223.

Importantly for this appeal, this Court described the factors—history, endorsement, and control—that courts in this Circuit must weigh when determining whether speech constitutes government speech. *Id.* at 1232–36. As to the history factor, courts must "ask whether the type of speech under scrutiny has traditionally 'communicated messages' on behalf of the government." *Id.* at 1232 (quoting *Walker*, 576 U.S. at 211). As to the endorsement factor, courts must ask "whether the kind of speech at issue is 'often closely identified in the public mind with the government.'" *Id.* (quoting *Summum*, 555 U.S. at 472). Finally, as to the control

factor, courts must ask "whether the relevant government unit 'maintains direct control over the messages conveyed' through the speech in question." *Id.* at 1234–35 (quoting *Walker*, 576 U.S. at 213). In discussing the control factor, this Court provided the caveat that "[n]o case precedent says that the government must control every word or aspect of speech in order for the control factor to lean toward government speech." *Id.* at 1235–36.

Unlike *Cambridge Christian*, this appeal presents this Court with a robust enough record to determine whether Mr. Gundy's invocation constitutes government speech. We discuss the three government speech factors—history, endorsement, and control— in turn and why the district court misapplied these factors. These three "factors are neither individually nor jointly necessary for speech to constitute government speech," but "a finding that *all* evidence government speech will almost always result in a finding that the speech is that of the government." *Leake*, 14 F.4th at 1248 (emphasis in original). All three factors lead us to conclude that Mr. Gundy's invocation constitutes government speech.

### i.    History

To begin, we must "ask whether the type of speech under scrutiny has traditionally 'communicated messages' on behalf of the government." *Cambridge Christian*, 942 F.3d at 1232 (quoting *Walker*, 576 U.S. at 211). Here, we agree with the district court's findings that "invocations are traditionally limited to a single purpose" of solemnizing "proceedings before legislatures engage in the . . . task of governance" and that the "traditional audience of an

invocation . . . is the legislature itself." But we disagree with the district court's unawareness "of any established tradition of invocations being used to communicate messages on behalf of a governmental body" as being both out of touch with the role of the City Council's particular invocation and the unique role that legislative invocations have played throughout this country's history and tradition.

Because this case involves a legislative invocation, our consideration of the history factor is informed by our prior discussion of the history and tradition of legislative invocations that often arises in the context of an Establishment Clause case. Under the record presented and the Webb Policy, the City Council "has long maintained a tradition of solemnizing its proceedings by allowing for an opening invocation before each meeting, for the benefit and blessing of the Council." This is nothing new—as we have already discussed, it has long been acknowledged that the "opening of sessions of legislative and other deliberative public bodies with prayer is deeply embedded in the history and tradition of this country," stemming from the "colonial times through the founding of the Republic and ever since." *Marsh*, 463 U.S. at 786. In fact, "there can be no doubt that the practice of opening legislative sessions with prayer has become part of the fabric of our society." *Id.* at 792. And, "[a]s a practice that has long endured, legislative prayer has become part of our heritage and tradition, part of our expressive idiom, similar to the Pledge of Allegiance, inaugural prayer, or

the recitation of 'God save the United States and this honorable Court.'" *Town of Greece*, 572 U.S. at 587.

While the invocation is meant for the benefit and the blessing of the City Council, which by itself militates toward a finding of government expression, *see Fields*, 936 F.3d at 158, the general public is still in attendance during the invocation. Indeed, the invocation precedes the City Council's official meetings, which members of the public participate in, making the invocation inherently "governmental in nature." *Turner v. City Council of City of Fredericksburg*, 534 F.3d 352, 354 (4th Cir. 2008) (O'Connor, J., retired and sitting by designation). Further, the invocation speaker is chosen by an active member of the City Council. Thus, the speaker is an invited agent of the City Council praying on behalf of the City Council and symbolically expressing "who and what" City Council members represent before the City Council members engage in public lawmaking. *Fields*, 936 F.3d at 158 (quoting *Town of Greece*, 572 U.S. at 588); *see also Ctr. for Inquiry, Inc. v. Marion Cir. Ct. Clerk*, 758 F.3d 869, 874 (7th Cir. 2014) (noting that "what a chosen agent of the government says" is inherently "part of the government's own operations").

Certainly, the history of the City Council's invocation and the well-established history and tradition of legislative invocations as part of the fabric of this country—akin to the Pledge of Allegiance—militate toward a finding of government speech. *Cf. Leake*, 14 F.4th at 1248 ("The history of military parades in general, and this [p]arade in particular, weighs in favor of finding that the

[p]arade was government speech."). Moreover, the format of the City Council's invocation preceding a public meeting in which City Council members will conduct business affairs also militates toward a finding of government speech. Thus, "history establishes both that the medium used here and the message conveyed through it are ones traditionally associated with governments." *Id.* at 1249. For these reasons, the history factor weighs in favor of a government speech finding.

ii.    Endorsement

Turning to the endorsement factor, we must ask "whether the kind of speech at issue is 'often closely identified in the public mind with the government.'" *Cambridge Christian*, 942 F.3d at 1232 (quoting *Summum*, 555 U.S. at 472). Like the history factor, we again agree with many of the district court's findings but disagree with its conclusion. Indeed, we agree that "there are certainly indicia that the [City] Council endorsed" Mr. Gundy's invocation in that the City Council "designated a portion of their public meeting for an invocation, maintained rules and appointed officers dedicated to ensuring an invocation took place, personally invited [Mr. Gundy] to perform the invocation, and allowed the invocation to take place on public property." But we disagree with the district court's assertion that the "endorsement factor is . . . complicated by the Establishment Clause" in concluding that the "endorsement factor does not weigh in favor of either party."

As a preliminary matter, we begin with the district court's conclusion that the Establishment Clause complicates the

endorsement factor.  The district court's apprehension about the Establishment Clause is misguided.  Indeed, "[b]ecause 'government speech must comport with the Establishment Clause' anyway, any Establishment Clause–based limits" cannot "change the conclusion that legislative prayer is government speech." *Fields*, 936 F.3d at 159 (citation omitted) (quoting *Summum*, 555 U.S. at 469); *see also Summum*, 555 U.S. at 482 (Scalia, J., concurring) (acknowledging the separate analyses for a government speech finding and a breach of the Establishment Clause finding).  And, as discussed below, beyond the fact that government speech is confined by the bounds of the Establishment Clause from the outset, this Court has its own Establishment Clause analytical framework, *see Pelphrey*, 547 F.3d at 1277–78, and Mr. Gundy has not alleged an Establishment Clause violation.

Having addressed this preliminary matter, we move to the district court's findings that we agree with.  As noted by the district court, the City Council's invocation can be closely identified in the public mind with the government because the City Council organizes the invocation, it provides the venue for the invocation, it selects the speaker for the invocation, and then it begins its business meeting.  *Cf. Mech*, 806 F.3d at 1076 ("The banners are hung on school fences, and government property is 'often closely identified in the public mind with the government unit that owns the land.'" (quoting *Summum*, 555 U.S. at 472)).  These facts are much like the facts analyzed in *Turner*, *see* 534 F.3d at 354 (noting that "[t]he prayer [was] an official part of every [c]ouncil meeting," the prayer

was "delivered as part of the opening" of the meeting along with Pledge of Allegiance, and the speaker was "called on by the [m]ayor"), when it determined that the purpose of the legislative prayer was "governmental in nature." Surely, a member of the public attending the City Council meeting in person or watching the meeting on the City Council's website, on which a public video of Mr. Gundy's invocation is available, would identify the invocation with the City Council, given the occasion. *Cf. Leake*, 14 F.4th at 1249 (discussing how the "[c]ity publicly advertised and promoted the 2019 [p]arade on its website" when analyzing whether the city endorsed the parade).

Moreover, Mr. Gundy, and other speakers, are *chosen* by City Council members to give an invocation "for the benefit and blessing of the Council." And "what a chosen agent of the government says" is "part of [the City Council's] own operations." *Ctr. for Inquiry*, 758 F.3d at 874. Here, the invocation speaker—the chosen agent—is part of the City Council's "ceremonial prayer . . . to show who and what" the City Council and its members stand for. *Town of Greece*, 572 U.S. at 588. Thus, the invocation speaker is "given the chance to pray on behalf of the government." *Turner*, 534 F.3d at 356. And even though the invocation speaker is a private party, the fact that a "private part[y] take[s] part in the . . . propagation of a message does not extinguish the governmental nature of the message or transform the government's role into that of a mere forum-provider." *Walker*, 576 U.S. at 217.

Thus, the endorsement factor weighs in favor of a government speech finding.

### iii.    Control

Finally, we must ask "whether the relevant government unit 'maintains direct control over the messages conveyed' through the speech in question." *Cambridge Christian*, 942 F.3d at 1234–35 (quoting *Walker*, 576 U.S. at 213). We note that "[n]o case precedent says that the government must control every word or aspect of speech in order for the control factor to lean toward government speech," and we do not create such precedent now. *Id.* at 1235–36; *accord Leake*, 14 F.4th at 1250 ("The government-speech doctrine does not require omnipotence."). This is because the Supreme Court and this Court have cautioned against judicial scrutiny of the *content* of prayers in all but the most extreme circumstances. *See, e.g.*, *Pelphrey*, 547 F.3d at 1274. And, as discussed below, we need not address the content of Mr. Gundy's invocation to determine that the City Council does exert control over the messages conveyed by invocation speakers. We, therefore, disagree with the district court's conclusion that the control factor did not weigh in the favor of a government speech finding.

The City Council exerts control over the messages conveyed by invocation speakers because inviting speakers to give invocations inherently exhibits governmental control over the invocation messages from the outset of the selection process. In Mr. Gundy's example, Mr. Gundy was "the literal speaker," but "he [was] allowed to speak only by virtue of his" being invited by a City

Council member. *See Turner*, 534 F.3d at 355. And while the City Council did not purport to have initial editorial rights over the exact content of the invocations, selecting one speaker over another exhibits control.

Indeed, selecting a sectarian speaker versus a nonsectarian speaker plausibly could lead to different messages conveyed through an invocation. *See id.* at 354–55 ("[T]he Council itself exercises substantial editorial control over the speech in question, as it has prohibited the giving of a sectarian prayer."); *see also Barker v. Conroy*, 921 F.3d 1118, 1132 (D.C. Cir. 2019) ("[The United States House of Representatives'] requirement that prayers must be religious nonetheless precludes [the plaintiff] from doing the very thing he asks us to order [the House] to allow him to do: deliver a secular prayer.") Taken to the logical extreme, it is plausible that a member of a hate group may give a vastly different invocation than, say, a priest or a rabbi. In this sense, the selection process for choosing invocation speakers gives the City Council inherent control over invocations and their messages from the outset, which is why maintaining a selection process and a "prayer opportunity as a whole" that are consistent with the confines of the Establishment Clause is so important. *See, e.g.*, *Town of Greece*, 572 U.S. at 585–86. Thus, the control factor weighs in favor of deeming Mr. Gundy's invocation government speech.

★ ★ ★ ★

Ultimately, all three factors point to a finding of government speech. For this reason, we agree with other circuits that have

examined the topic of legislative prayer constituting government speech—"[a]t bottom, the [City Council] is the speaker" and Mr. Gundy's invocation is government speech. *See, e.g.*, *Fields*, 936 F.3d at 158; *see also Morris Cnty. Bd. of Chosen Freeholders v. Freedom From Religion Found,*, 139 S. Ct. 909, 910–11 (2019) (Kavanaugh, J., respecting denial of cert.) (citing *Marsh* and *County of Allegheny* to distinguish case being denied certiorari from instances "where the government itself is engaging in religious speech, such as a government-sponsored prayer or a government-sponsored religious display"). We find support for this position in the fact that a private speech and forum analysis would place this Court in the precarious position of comparing the contents of one invocation to another to determine whether any restriction on the delivery of an invocation was applied in an arbitrary or haphazard manner, as the district court did when it conducted such analysis and compared the contents of Mr. Gundy's invocation to those of Dr. Louh's invocation. In sum, Mr. Gundy's invocation before the City Council is government speech, confined by the bounds of the Establishment Clause. *See Summum*, 555 U.S. at 468.

## B.  Mr. Gundy's Appeal Must Fail

Mr. Gundy brought claims under the Free Speech and Free Exercise Clauses of the United States Constitution. He did not bring a claim under the Establishment Clause. And since his invocation constitutes government speech, his speech is "not susceptible to an attack on free-speech[] [or] free-exercise . . . grounds." *Fields*, 936 F.3d at 163; *accord Simpson*, 404 F.3d at 288 ("[T]he

standards for challenges to government speech . . . require that [the plaintiff's free speech and free exercise claims] must be rejected."). As such, this Court need not turn to the factors articulated in *Pelphrey*—namely, weighing (1) the identity of the invocation speaker, (2) the process by which the invocation speaker is selected, and (3) the nature of the prayer—and potentially parse through Mr. Gundy's invocation to determine if the Establishment Clause has been violated.

## IV.    CONCLUSION

While we hold that the district court erred in deeming Mr. Gundy's invocation to be private speech in a nonpublic forum, we AFFIRM the district court's orders on the alternative ground that the invocation constitutes government speech, not subject to attack on free speech or free exercise grounds.

**AFFIRMED.**